# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

——————

No. 04-1005

——————

United States of America,        *
\*

     Appellee,        *
\*

  v.         *  Appeal from the United States
\*  District Court for the

Dante G. Frazier,       *  District of Nebraska.
\*

     Appellant.      *

——————

Submitted:  June 15, 2004
Filed:  May 31, 2005

——————

Before SMITH, BEAM, and COLLOTON, Circuit Judges.

——————

BEAM, Circuit Judge.

On July 25, 2003, a jury convicted Appellant Dante Frazier of knowingly or intentionally possessing pseudoephedrine with the knowledge or reasonable belief that the pseudoephedrine would be used in the manufacture of methamphetamine. Frazier appeals, arguing that 1) the district court[1] improperly denied his motion to suppress the evidence; 2) the government's use of postarrest, pre-<u>Miranda</u> silence violated his Fifth Amendment right against self-incrimination; 3) the district court erred in denying his motion for judgment of acquittal; and 4) the district court erred

——————

[1]The Honorable Laurie Smith Camp, United States District Judge for the District of Nebraska.

in its application of the federal sentencing guidelines. For the reasons set forth below, we affirm.

## I.     BACKGROUND

Given Frazier's challenges on appeal, we note a distinction between those facts heard by the district court during the suppression hearing and those heard by the jury during trial. All facts related to the investigators' motives for suspecting Frazier of drug activity were presented to the district court during the suppression hearing and are relevant only to Frazier's equal protection challenge. Those facts are not colored by the lens of a jury verdict. We state all remaining facts in the light most favorable to the jury's verdict, accepting as established all reasonable inferences supporting the verdict. United States v. Munoz, 324 F.3d 987, 990 (8th Cir. 2003).

On November 6, 2002, Investigators Richard Lutter and Anthony Sattlefield of the Nebraska State Patrol Drug Commercial Interdiction Unit were conducting commercial interdiction duties. While sitting in the drive-through of a fast food chain off of I-80 in Nebraska, they noticed a U-Haul truck fueling at a gas station about seventy-five yards directly in front of them. The officers suspected drug activity based on their training and experience. They deduced that the occupants of the U-Haul were either traveling across the country or had just stayed at an adjacent motel, because there was no U-Haul rental facility nearby. However, the investigators noted that the size of the U-Haul, and the fact that there was no vehicle accompanying the U-Haul, was not consistent with that assessment. The U-Haul was a seventeen-foot, single-bedroom size truck, which would be more useful for a local move. A man, later identified as Dante Frazier, was washing the windshield and fueling the vehicle.

The investigators drove to the gas station and stopped in front of the U-Haul for a short time. They noticed a brand new padlock securing the latch of the U-Haul truck. They found this significant because people transporting illegal narcotics are

likely to lock the load. Additionally, the officers noted that the U-Haul was from Arizona, a "source area" for controlled substances. Finally, the investigators noticed a Bible on the front dash, which they contended is a common method drug couriers use to avoid suspicion.

Given the totality of these observations, the investigators considered contacting the U-Haul's occupants at the gas station, but they decided that they did not have time. They followed the vehicle when it left. The investigators then called a traffic unit for assistance in the event the investigators found a reason to stop the U-Haul. In that call, they described the U-Haul, its license plate, and the gender and race of its occupants. Trooper Stephen Rasgorshek responded to the call and later stopped the U-Haul for failing to maintain a lane of travel. The U-Haul pulled off the interstate and Trooper Rasgorshek, as well as Investigators Lutter and Sattlefield, pulled in behind.

Trooper Rasgorshek approached the driver's side of the vehicle and asked Frazier for his license and rental agreement. During the stop Trooper Rasgorshek also spoke with Frazier and the passenger, David Williams. Frazier and Williams gave conflicting reports about the purpose of their trip. Frazier said he was moving his ex-wife's and children's furniture to California, and he planned to stay in California for one week and then fly back to Chicago. Williams said he was helping Frazier move his cousin's furniture to Los Angeles, that Frazier's cousin was going to fly from Chicago to Los Angeles to meet them, and that he and Frazier were going to drive back to Chicago after a few days in California.

Trooper Rasgorshek asked Frazier for permission to search the U-Haul and Frazier produced the padlock key. Trooper Rasgorshek and Investigator Lutter then searched the vehicle. Once in the bed of the U-Haul, Investigator Lutter described the load as being a perfect representation of what a "cover load" would look like–including brand new furniture (like a combination set purchased at a furniture

-3-

store) and an old stove, washer and dryer. None of the furniture was tied down or padded in any way, and it all appeared to be thrown into the rear of the vehicle with no personal items at all except some dirty clothes stuck to the inside of the washer. Behind two mattresses in the back of the truck the officers discovered boxes containing large plastic bags filled with white pills. Lutter opened one of the boxes and examined the pills. He believed they were pseudoephedrine given the quantity. He instructed the other officers to arrest the individuals for possessing a controlled substance. Trooper Rasgorshek testified that when Frazier was arrested, his reaction was neither angry, surprised, nor combative. Frazier did not say anything when the officers told him why he was being arrested. After a more thorough search of the U-Haul, officers recovered forty-eight boxes of pseudoephedrine, each with a label indicating the quantity of "five times 17,000 tablets," containing over four million, 60 milligram tablets.

After the arrest, the troopers took Frazier to the Nebraska State Patrol traffic office. Investigators Lutter and Sattlefield advised Frazier of his <u>Miranda</u> rights before they interviewed him. During the interview, Frazier told the investigators that he had been contacted by "Jay," who asked him to drive the U-Haul from Chicago, Illinois, to Ontario, California, and offered to pay Frazier $1,500 for the trip. Once in Ontario, Frazier was to park at a particular location and call a cell phone number that Jay had given him. Frazier also said that Williams was already in the vehicle in Chicago when Frazier arrived, and they drove together. Frazier further stated that this was the second such trip he had taken and that he had just completed the earlier trip for which he was paid $1,000. The Southwest Airlines ticket stub located by the investigators during their search evidenced that earlier trip. During a second interview Frazier provided additional information about the individuals that had accompanied him on his first trip, as well as information about Jay, who had contacted him about the trips and provided the cell phone.

-4-

Frazier was ultimately indicted for possessing pseudoephedrine, a list I chemical, knowing or having reasonable cause to believe that the chemical would be used to manufacture a controlled substance. Frazier filed a motion to suppress the evidence under the Fourteenth Amendment's Equal Protection Clause, arguing that the officers had targeted him because of his race. The magistrate judge[2] recommended that the district court deny the motion to suppress, and the district court approved the recommendation. A jury found Frazier guilty on July 25, 2003, and the district court sentenced Frazier to 188 months' imprisonment.

## II.    DISCUSSION

### A.    Equal Protection Claim

"We review suppression issues under a two-pronged standard of review: the district court's factual findings are reviewed for clear error; its legal conclusions are reviewed de novo." United States v. Sheikh, 367 F.3d 756, 762 (8th Cir. 2004). At his suppression hearing, Frazier argued that he and his passenger were the subject of racial discrimination and targeted for investigation because of their race. The district court held that the investigators were credible when they testified that race did not influence their decision to pursue the U-Haul truck.

"'[T]he Constitution prohibits selective enforcement of the law based on considerations such as race . . . [and] the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause . . . .'" Johnson v. Crooks, 326 F.3d 995, 999 (8th Cir. 2003) (quoting Whren v. United States, 517 U.S. 806, 813 (1996)). Like the Sixth Circuit in United States v. Avery, 137 F.3d 343, 353 (6th Cir. 1997), we recognize that encounters with officers may

---

[2]The Honorable Kathleen A. Jaudzemis, United States Magistrate Judge for the District of Nebraska (now retired).

violate the Equal Protection Clause when initiated solely based on racial considerations. United States v. Woods, 213 F.3d 1021, 1022-23 (8th Cir. 2000). Drawing on ordinary equal protection standards, this claim requires proof that the investigators targeted Frazier solely because of his race. Johnson, 326 F.3d at 1000; see also Avery, 137 F.3d at 355. "An officer is not held to a 'suspicion of criminal activity standard' when he embarks to investigate someone. The officer merely is prohibited from his pursuit if he acts based solely on race." Avery, 137 F.3d at 358. In a pre-contact type of case such as this one (the stage at which an officer decides to target someone for surveillance), Frazier may prove a prima facie equal protection claim with direct evidence of racial discrimination. Johnson, 326 F.3d at 1000; see also Avery, 137 F.3d at 355 (discussing the equal protection analysis and highlighting the fact that ultimately the "stage" of investigation is irrelevant; the inquiry is whether a government actor has imposed unequal burdens based upon race).

In support of his claim, Frazier generally argued that each of the investigator's explanations about their initial suspicions, in and of themselves, are not supported by sound reasoning and do not justify their decision to approach Frazier. Further evidence of invidious discrimination, he argued, is the fact that Investigator Lutter specifically told Trooper Rasgorshek that the men in the U-Haul were black when he called Rasgorshek for assistance. Like the district court, we find that Frazier has failed to establish an equal protection claim.

Reviewing the evidence submitted at the suppression hearing, we recognize that the stated indicators and disclaimers identified by the investigators were highly consistent with innocent behavior by many law-abiding motorists and may not have been sufficient to raise a reasonable, articulable suspicion that drug trafficking activities might be in progress. We need not analyze that issue in reaching our decision, however.

-6-

Whether the officers acted on a legitimate "hunch" or even arbitrarily in their investigation, Frazier lacks sufficient proof of discrimination to proceed with that inquiry. Under our cases, Frazier "must 'identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive.'" Johnson, 326 F.3d at 1000 (quoting Crawford-El v. Britton, 523 U.S. 574, 600 (1998)). Frazier's attack on the officers' credibility is insufficient to establish an equal protection violation. Frazier failed to provide enough evidence to establish that the officers targeted him solely because of his race. See id.

## B. Fifth Amendment Claim

Frazier also argues that testimony elicited by the government during its case-in-chief concerning Frazier's silence after arrest violated his Fifth Amendment right against self-incrimination. This we review de novo. United States v. Washington, 318 F.3d 845, 854-55 (8th Cir.), cert. denied, 124 S. Ct. 251, and cert. denied sub nom., 124 S. Ct. 209 (2003).

The Fifth Amendment to the United States Constitution provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The core protection afforded by the Fifth Amendment is a prohibition on compelling a criminal defendant to testify against himself at trial. See, e.g., Chavez v. Martinez, 538 U.S. 760, 767 (2003) (plurality opinion). "To give full effect to this protection, the Supreme Court has held that 'the fifth amendment . . . forbids . . . comment by the prosecution on the accused's silence . . . .'" United States v. Moore, 104 F.3d 377, 385 (D.C. Cir. 1997) (omissions in original) (quoting Griffin v. California, 380 U.S. 609, 615 (1965)).[3] At issue in the instant case is whether the

---

[3]Griffin, however, dealt specifically with the prosecutor's comment on the defendant's failure to testify at trial. Griffin did not determine the propriety of prosecutorial comment on a defendant's pre-trial silence. See Moore, 104 F.3d at 385.

use of Frazier's postarrest, pre-<u>Miranda</u> silence during the government's case-in-chief was constitutional. This is an issue of first impression in our circuit.

The following is an example of the line of questioning at issue:

Q [Prosecutor]: Did you talk with Mr. Frazier . . . or tell [him] why [he was] being arrested?

A [Officer]: I just told [him] that [he was] under arrest for suspicion of narcotics.

Q:     What was Mr. Frazier's reaction when you . . . placed him into custody?

A:     There really wasn't a reaction.

Q:     Was he angry?

A:     No, sir.

Q:     Was he surprised?

A:     No, sir.

Q:     Did he become combative?

A:     No, sir.

---

"However, the Supreme Court has elsewhere made clear that 'the prosecution may not . . . use at trial the fact that [the defendant] stood mute or claimed his privilege in the face of accusation' when he was 'under police custodial interrogation.'" <u>Id.</u> (omission and alteration in original) (quoting <u>Miranda v. Arizona</u>, 384 U.S. 436, 468 n.37 (1966)). Thus, this protection extends to at least the time of custodial interrogation. The question we must address is whether it extends further.

Q:    Did he say anything to you?

A:    No, sir.

Q:    Did he do anything when you put the handcuffs on him?

A:    No, sir.

At closing, the government noted Frazier's conduct after arrest as one factor that could be indicative of guilt.  "If a person has a friend who betrays them, what's the innocent person going to do when they discover they're going to jail.  Everybody else is back in Chicago.  Are they going to become combative, angry, emotional, demanding?  There was none of them from . . . Mr. Frazier."

Frazier argues that because the introduction of his silence was not for impeachment purposes, it was improper.  The use of silence in criminal cases has been addressed by the Supreme Court under almost all but the instant circumstances.  In <u>Doyle v. Ohio</u>, 426 U.S. 610 (1976), the Court held that impeachment use of a defendant's postarrest, post-<u>Miranda</u> silence violated the Due Process Clause of the Fourteenth Amendment,  <u>id.</u> at 619, because 1) post-<u>Miranda</u> silence is insolubly ambiguous and may be nothing more than an arrestee's exercise of <u>Miranda</u> rights, and 2) <u>Miranda</u> warnings carry an implicit assurance that silence will not be used against the arrestee and thus use of silence for purposes of impeachment would penalize the defendant for relying on the government's assurances.  <u>Id.</u> at 617-18.

The admissibility of postarrest, post-<u>Miranda</u> silence in the case-in-chief was addressed by the Supreme Court in <u>Wainwright v. Greenfield</u>,  474 U.S. 284 (1986).  There, the defendant, after being given <u>Miranda</u> warnings, repeatedly stated that he understood his rights and wanted to speak to a lawyer.  <u>Id.</u> at 286.  At trial, the defendant pleaded not guilty by reason of insanity and the government attempted to introduce evidence in its case-in-chief that the defendant invoked his right to counsel

in the face of questioning, suggesting in closing that the defendant's repeated requests for counsel and refusal to answer questions were inconsistent with his claim of insanity.  Id. at 287.  The Court held that such evidence, like that at issue in Doyle, was inadmissible as substantive evidence of guilt because it is equally unfair to promise an arrested person that his silence will not be used against him and then use that silence to overcome his plea of insanity.  Id. at 292.

Turning to postarrest, *pre*-Miranda silence, the Court in Fletcher v. Weir held that the use of such evidence for purposes of impeachment did *not* violate Due Process.  455 U.S. 603, 607 (1982).  The Court rejected the argument that "'an arrest, by itself, is governmental action which implicitly induces a defendant to remain silent.'"  Id. at 606 (quoting Fletcher v. Weir, 658 F.2d 1126, 1131 (6th Cir. 1981)).  "In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand."  Id. at 607.  Again, though, the holding in Fletcher is restricted to use of silence for impeachment purposes.

The use of postarrest, pre-Miranda silence in the government's case-in-chief is still in dispute and has yet to be addressed by this court.  It has been noted that the "privilege against compulsory self-incrimination is simply irrelevant to a citizen's decision to remain silent when he is under no official compulsion to speak."  Jenkins v. Anderson, 447 U.S. 231, 241 (1980) (Stevens, J., concurring) (neither the Fifth nor the Fourteenth Amendment poses any obstacle to the use of prearrest silence for impeachment purposes).  The crux of our inquiry today is to determine at what point a defendant is under "official compulsion to speak" because silence in the face of such compulsion constitutes a "statement" for purposes of a Fifth Amendment inquiry.

Does the use of postarrest, pre-Miranda silence during the government's case-in-chief constitute an impermissible use of an accused's coerced incriminating "statement?" There is a conflict of authority on the question. See United States v. Hernandez, 948 F.2d 316, 323 (7th Cir. 1991) (refusing the introduction of impeaching evidence of silence during the prosecutor's case-in-chief); United States v. Velarde-Gomez, 269 F.3d 1023, 1029 (9th Cir. 2001) (en banc) (recognizing that because the right to remain silent derives from the Constitution and not from the Miranda warnings, commenting on a defendant's invocation of his right to silence violates the Fifth Amendment); Moore, 104 F.3d at 385 (holding that custody and not interrogation is the triggering mechanism for the right of pretrial silence under Miranda). But see United States v. Rivera, 944 F.2d 1563, 1567-68 (11th Cir. 1991) (recognizing that the government may comment on a defendant's silence if the silence occurred before Miranda warnings are given); United States v. Love, 767 F.2d 1052, 1063 (4th Cir. 1985) (same). On the facts before us, we find no Fifth Amendment violation.

Although we have previously held that "'the receipt of *Miranda* warnings is determinative of the constitutional issue,'" Vick v. Lockhart, 952 F.2d 999, 1003 (8th Cir. 1991) (quoting United States v. Massey, 687 F.2d 1348, 1353 (10th Cir. 1982)), the more precise issue is whether Frazier was under any compulsion to speak at the time of his silence. He was not. Although Frazier was under arrest, there was no governmental action at that point inducing his silence. Thus he was under no government-imposed compulsion to speak. It is not as if Frazier refused to answer questions in the face of interrogation. We are speaking in this case only of the defendant's silence during and just after his arrest. As noted earlier, an arrest by itself is not governmental action that implicitly induces a defendant to remain silent. Fletcher, 455 U.S. at 606. Therefore, on these facts, the use of Frazier's silence in the government's case-in-chief as evidence of guilt did not violate his Fifth Amendment rights. We do not decide today whether compulsion may exist under any other postarrest, pre-Miranda circumstances.

-11-

But even if the government's conduct here violated the Constitution, we would still affirm.  Ordinarily we review <u>Doyle</u>-type claims under the harmless error standard, which requires "'the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'"  <u>Vick</u>, 952 F.2d at 1002 (quoting <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967)).  Here, however, because there was no objection to the specific line of questioning mentioned above, we review its admissibility for plain error and find none.[4]  Fed. R. Crim. P. 52(b).

The overwhelming evidence developed at trial establishes Frazier's guilt beyond a reasonable doubt including, among other things, the contradictory reasons for the purpose of the trip; Frazier's previous trip under similar circumstances; Frazier's inconsistency in stating whether he knew his passenger prior to the trip, as well as several other contradictory statements; the contents of the U-Haul; the partial concealment of the drugs within the U-Haul under the "cover load;" and the sheer volume of pills.  In light of the above, even if we were convinced that the prosecutor's reference to Frazier's silence was improper, which we are not, its admission at trial was not plainly erroneous.

## C.    Sufficiency of the Evidence

Frazier further argues that there was insufficient evidence at trial of his knowledge of the pseudoephedrine.  We review the evidence in the light most favorable to the jury's verdict, reversing only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt. <u>United States v. Serrano-Lopez</u>, 366 F.3d 628, 634 (8th Cir. 2004).

_____

[4]Frazier's counsel objected to a subsequent, similar line of questioning concerning whether Trooper Rasgorshek heard Mr. Frazier say anything while they were at the 66 Station, but no objection was made during the line of questioning at issue on appeal and specifically noted in this opinion.

For the jury to find Frazier guilty, the government had to prove beyond a reasonable doubt that he 1) knowingly possessed the pseudoephedrine, and 2) he knew or had reasonable cause to believe it would be used to manufacture a controlled substance. 21 U.S.C. § 841(c)(2). Possession can be actual or constructive. Here, Frazier was not in physical possession of the pseudoephedrine so the government was charged with proving constructive possession. "'[C]onstructive possession requires knowledge of an object, the ability to control it, and the intent to do so.'" Serrano-Lopez, 366 F.3d at 634-35 (quoting United States v. Lee, 356 F.3d 831, 837 (8th Cir. 2003), cert. denied sub nom., 124 S. Ct. 2830 (2004)). Frazier contends the issue at trial was knowledge–did Frazier know he was carrying pseudoephedrine, and if he did, did he know it would be used to manufacture methamphetamine?

> We are cognizant of the inferential nature of the proof of knowledge. But a defendant's knowledge generally is difficult to prove in any other way. We guard against the use of unreasonable inferences through our standard of review, but we do not require that the inferences themselves be shown by the evidentiary standard applicable to the determination of guilt.

Id. at 636.

In the present case, drawing all reasonable inferences in favor of the guilty verdict returned by the jury, the government presented sufficient evidence from which a jury could have found beyond a reasonable doubt that Frazier knowingly possessed pseudoephedrine, and knew or had reason to believe it would be used to manufacture a controlled substance. The large quantity of pseudoephedrine (over four million tablets) is evidence of Frazier's knowledge. Even if Frazier did not own the U-Haul or the contents being transported, it is unlikely that the owner would place such a significant amount of pseudoephedrine in the hands of people who do not know it is there. See Serrano-Lopez, 366 F.3d at 635. This was also Frazier's second trip. And, in addition to the facts noted previously in support of our plain error determination,

-13-

including Frazier's own contradictory statements, Frazier also had possession of the key to the padlock for the U-Haul. Each of these facts supports an inference of knowledge in this case. We are unable to conclude that no reasonable jury could have found Frazier guilty beyond a reasonable doubt.

### D.   Sentencing

Frazier was convicted under 21 U.S.C. § 841(c)(2) and was sentenced pursuant to U.S.S.G. § 2D1.11. Because Frazier was found responsible for 244.8 kilograms of pseudoephedrine, he was placed at a base offense level of 38. However, at sentencing, the district court found Frazier was a minor participant and adjusted his offense level down two levels, resulting in an adjusted offense level of 36. Frazier challenges this sentence, arguing that the level 30 cap listed in U.S.S.G. § 2D1.1 should apply, as that guideline is "inextricably linked" with section 2D1.11. We disagree.

A district court's interpretation and application of the Sentencing Guidelines are reviewed de novo. United States v. Ashley, 342 F.3d 850, 852 (8th Cir. 2003). Based upon our de novo review, we affirm the district court's sentence. The applicable guideline for a violation of 21 U.S.C. § 841(c)(2) is section 2D1.11. Despite Frazier's arguments to the contrary, section 2D1.1 does not apply in this instance. The plain language of section 2D1.11 remains clear. We therefore affirm Frazier's sentence.

### E.   **Blakely** Issue

By way of briefing on a petition for rehearing, Frazier challenges the constitutionality of the Guidelines under United States v. Booker, 125 S. Ct. 738 (2005). The district court sentenced Frazier under a mandatory guidelines scheme

based on a drug quantity not charged in the indictment nor found by the jury. That finding violated Frazier's Sixth Amendment rights. Id. at 756.

Frazier argues that the district court's error in applying a mandatory sentencing scheme affected his substantial rights because the district court recognized the discrepancy between the offense level cap in section 2D1.1(a)(3) and its omission under section 2D1.11, but refrained from "revising" the Guidelines and sentenced Frazier at the low end of the Guidelines' range.

Because Frazier did not raise this claim below, our review is only for plain error. United States v. Pirani, No. 03-2871, 2005 WL 1039976, at *3 (8th Cir. Apr. 29, 2005) (en banc). To demonstrate plain error, Frazier must show that there is a reasonable probability that he would have received a more favorable sentence had the judge sentenced him under the advisory guidelines system. Id. at *6. Frazier cannot make this showing.

Frazier argues that his sentence at the low end of the guidelines range and the court's express refusal to "revise" the guidelines demonstrates prejudice. We disagree. While the court sentenced Frazier at the low end of the range, the court expressly noted this was largely due to Frazier's lack of criminal history and also due to some of the evidence submitted with respect to Frazier's motion for a downward departure for aberrant behavior. And, the court's refusal to "revise" the guidelines was merely a statement asserting, "I'm not intending to revise these guidelines that I have just delineated for the record." Under Pirani, that is not enough to carry Frazier's burden. Id. at *7. "'[W]here the effect of the error on the result in the district court is uncertain or indeterminate–where we would have to speculate–the appellant has not met his burden of showing a reasonable probability that the result would have been different but for the error.'" Id. (quoting United States v. Rodriguez, 398 F.3d 1291, 1301 (11th Cir. 2005)).

## III. CONCLUSION

For the reasons stated herein, we affirm.

_____