STATE of Minnesota, Respondent,

v.

Brett David BORG, Appellant.

No. A09–243.

Court of Appeals of Minnesota.

March 9, 2010.

---

Lori Swanson, Attorney General, St. Paul, MN; and Jan Kolb, Mille Lacs

County Attorney, Milaca, MN, for respondent.

Marie Wolf, Interim Chief Public Defender, Jodie L. Carlson, Assistant Public Defender, St. Paul, MN, for appellant.

Considered and decided by MINGE, Presiding Judge; SCHELLHAS, Judge; and STAUBER, Judge.

## OPINION

STAUBER, Judge.

Appellant challenges his conviction of third-degree criminal sexual conduct on the grounds that: (1) the evidence was insufficient to sustain his conviction; (2) the district court erred in ruling that the state could elicit evidence of appellant's pre-arrest silence in the state's case-in-chief before appellant testified; (3) the prosecutor engaged in prejudicial misconduct; (4) the district court abused its discretion in refusing to impose a dispositional departure based on appellant's lack of remorse when the record otherwise supported a departure; and (5) he is entitled to specific performance of the state's plea offer. Because the district court erred in allowing the state to comment on appellant's pre-arrest silence and because we conclude the error was not harmless, we reverse and remand.

## FACTS

On May 6, 2004, J.S. celebrated her 18th birthday at Grand Casino in Mille Lacs with her 18–year–old girlfriends, K.K. and D.C., and her 19–year–old girlfriend, M.W. D.C.'s mother provided the girls with a room at the casino hotel, and D.C.'s 25–year–old brother, S.C., along with his 24–year–old friends, Brett Borg (appellant) and T.B., met the girls at the casino. J.S. and S.C. were dating, and M.W. and appellant had met a few times previously. In light of their previous contact, M.W. considered appellant to be an acquaintance.

The group gambled at the casino and drank beer and Grape Pucker (an alcoholic beverage) in the hotel room and then decided to go swimming at nearby Eddy's Resort. They stayed at Eddy's for about an hour, "goofin around" and having fun at the pool. Some brought beer to the pool, and appellant poured M.W. a beer.

After swimming, the group returned to their hotel. J.S. and S.C. retired to their own room, and the rest of the group stayed in the room that had been "reserved for [the] girls." D.C. and K.K. slept in one bed, and T.B., M.W., and appellant slept in the other bed. Shortly after going to bed, appellant and M.W. had sexual intercourse.

The next morning, J.S. came into the room and told M.W. that she heard that M.W. had sex with appellant. M.W. responded by telling J.S. that she could not have had sex because she was menstruating. However, M.W. then realized that she was missing her tampon. According to M.W., she became very upset and told J.S. that she had not consented to sex with appellant. J.S. and M.W. subsequently discussed the possibility that appellant had used a date-rape drug, and that theory was relayed to D.C., who had been in the casino gambling. D.C. then confronted appellant, who was still sleeping, by hitting him in the face. "[S]hocked" by the punch and the allegations, appellant got out of bed and left the hotel.

M.W.'s parents arrived at the hotel and took M.W. to the hospital where a sexual assault examination was performed and M.W. was tested for three common date-rape drugs. The tests for the date-rape drugs came back negative, but the sexual-assault examination showed the presence of semen. Subsequent tests revealed that the DNA in the semen matched the DNA

sample provided by appellant. Based on M.W.'s allegation that she did not consent to sex, appellant was arrested and charged with one count of third-degree criminal sexual conduct in violation of Minn.Stat. § 609.344, subd. 1(d) (2002). The charge required the state to prove that appellant engaged in sexual penetration with M.W. knowing that M.W. was mentally incapacitated or physically helpless.

At trial, M.W. testified that on the night of the alleged sexual assault, she rode to Eddy's Resort in the shuttle bus. According to M.W., the group was "goofin' around" at the pool and "[h]aving fun," but she denied flirting with or kissing appellant. M.W. also testified that she had about four or five beers and a couple sips of Grape Pucker during the evening, and that while they were at the pool, appellant poured her a beer while his back was turned toward her. M.W. further testified that when she got out of the pool, she felt "really tired," and that she "fell over" when she was in the bathroom getting changed.

After returning to the hotel, M.W. changed into her pajamas and went to bed. M.W. testified that she woke up when T.B. and appellant crawled into her bed, but that she did not feel threatened because she knew them. According to M.W., she dozed in and out of sleep, and woke up when appellant put his arm over her stomach. M.W. testified that she wanted to move it, but was too tired. M.W. also claimed that she did not remember anything else until she woke up the next morning and noticed that her "underwear and . . . and pants were both pulled up to [her] hip on [her] left leg but completely off of [her] right" leg. According to M.W., she then went into the bathroom where she was informed by J.S. that she had sex with appellant. At that point, M.W. noticed that her tampon was missing. M.W.

testified that she immediately became very upset, and "completely sick." M.W. further testified that she did not feel comfortable engaging in sexual activity in a room full of people or while menstruating and did not consent to sex with appellant.

K.K. testified that S.C. drove to the pool and that M.W. had climbed over the seat to sit next to appellant on the ride to the pool. K.K. also testified that everyone was "horsing" around at the pool, but did not believe that M.W. was "especially friendly" with appellant. K.K. further testified that after the group was back at the hotel, she heard M.W. say she was going to sleep and then saw her shut her eyes after she had crawled into bed. According to K.K., she later noticed some movement under the blanket and thought that appellant and M.W. were "fooling around." Although K.K. claimed that she did not know for certain that M.W. and appellant were having sex, she testified that she heard M.W. moan and did not intervene because she thought whatever was happening was consensual based on M.W.'s moan.

J.S. testified that she did not remember much about the events occurring at the pool and claimed that she did not notice anything unusual about M.W.'s demeanor. J.S. also testified that after she retired to her boyfriend's hotel room, she received a text message from D.C. stating, "I think that [appellant] and [M.W.] are having sex but I'm not sure." According to J.S., she was "shocked" when she got the text message because M.W. never mentioned having feelings toward appellant and, as her best friend, she assumed that M.W. would have confided in her if she were interested in appellant. J.S. further testified that, after M.W. denied having sex with appellant, she found M.W.'s tampon on the floor between the beds. J.S. claimed that M.W. then told her that she did not remember or consent to having sex.

Appellant testified in his defense and claimed that he kissed M.W. at the pool. Appellant also testified that the group was playing "chicken" in the pool, a game where the girls sit on the boys' shoulders in the pool. According to appellant, M.W. was his partner during the "chicken" games. Appellant did not remember pouring a cup of beer for M.W., and denied drugging her. Appellant further testified that after the group returned to the hotel, he laid down on the one of the beds but was told by K.K. that the bed was hers. Appellant claimed that as a result, he then got into the other bed next to T.B. Later, M.W. proceeded to get in the bed next to him with her back to him and laid her head on his arm.

In contrast to M.W.'s testimony, appellant claimed that after M.W. got into bed, he gave her a provocative back massage. According to appellant, he asked M.W. if it felt good, and she said yes and indicated that she wanted him to continue. Appellant further testified that the backrub was followed by even more intimate physical contact and eventually consensual sexual intercourse.

The next morning, appellant was "shocked" when D.C. struck him in the face. According to appellant, he "didn't know what was goin' on," so he just left. Appellant claimed that he did not know M.W. was menstruating and assumed that M.W. had removed her tampon because he was not aware of the presence of a tampon until the next morning. Appellant also claimed that M.W. was "definitely" awake when they had sex and that she did not seem drunk. Appellant further testified that he thought M.W. "was into [him]" because they had been flirting earlier, and that he "couldn't believe it" when he heard the allegations.

T.B. and D.C. both testified for the defense and both remembered playing "chicken" at the pool. T.B. testified that he observed appellant and M.W. flirting and saw them kiss, but claimed that after the group returned to the hotel he went to sleep and did not awake until the following morning. D.C. testified that she saw appellant and M.W. having sex under the blanket, and heard M.W. moaning. D.C. further testified that M.W. did not appear to be intoxicated and did not appear to be asleep during the sexual contact.

Following the trial, the jury returned a guilty verdict on the charge of sexual penetration involving physical helplessness and a not guilty verdict on the charge of sexual penetration involving mental incapacitation. Appellant subsequently filed a motion for a new trial, alleging that the state's discovery violation deprived him of a fair trial. Appellant also moved for a dispositional departure. The district court denied appellant's motions and imposed the presumptive sentence of 48 months in prison. This appeal followed.

## ISSUES

I. Is there sufficient evidence to sustain appellant's conviction of criminal sexual conduct in the third degree?

II. Did the district court abuse its discretion in ruling that the state could elicit evidence of appellant's pre-arrest silence in the state's case-in-chief before appellant testified?

## ANALYSIS

### I. Sufficiency of evidence

 In considering a claim of insufficient evidence, this court's review is "limited to a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the [jurors] to reach the verdict which they did." *State v. Webb*, 440 N.W.2d 426, 430 (Minn.

1989). The reviewing court must assume that the fact-finder "believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Moore*, 438 N.W.2d 101, 108 (Minn.1989). This court will not disturb the verdict if the fact-finder, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant is guilty of the charged offense. *Bernhardt v. State*, 684 N.W.2d 465, 476–77 (Minn.2004).

"A person who engages in sexual penetration with another person is guilty of criminal sexual conduct in the third degree if . . . the actor knows or has reason to know that the complainant is . . . physically helpless." Minn.Stat. § 609.344, subd. 1(d) (2002). " 'Physically helpless' means that a person is (a) asleep or not conscious, (b) unable to withhold consent or to withdraw consent because of a physical condition, or (c) unable to communicate nonconsent and the condition is known or reasonably should have been known to the actor." Minn.Stat. § 609.341, subd. 9 (2002). " 'Consent' means words or overt actions by a person indicating a freely given present agreement to perform a particular sexual act with the actor." *Id.*, subd. 4(a) (2002).

Appellant argues that the evidence is insufficient to sustain his conviction of third-degree criminal sexual conduct because the state failed to prove beyond a reasonable doubt that he knew or had reason to know that M.W. was physically helpless. Although appellant acknowledges that under Minn.Stat. § 609.347, subd. 1 (2002), corroboration of M.W.'s testimony was not necessary to prosecute him for third-degree criminal sexual conduct, appellant cites *State v. Ani*, for the proposition that there may be cases in which the absence of corroboration might

mandate a holding that the evidence was legally insufficient. 257 N.W.2d 699, 700 (Minn.1977) (stating that there may be cases in which the testimony of the complainant is such that a reversal by this court may be necessary absent corroboration). Appellant argues that this is such a case because all the other witnesses to his physical contacts with M.W. testified in support of his assertion that he did not know or have reason to know that M.W. was physically helpless or that the sexual contact was unwanted.

Appellant testified at trial that he and M.W. engaged in consensual sex. Appellant also insisted that M.W. was not only awake when they had sex, but claimed that she kissed him first after he gave her a back massage. T.B. testified that M.W. was flirting with appellant, and he noticed appellant kissing M.W. at the pool. Moreover, K.K., who testified for the state, claimed that M.W. climbed over the seat of S.C.'s truck so that she could sit next to appellant during the ride to Eddy's Resort. K.K. also agreed that such conduct constituted "flirting." Both D.C. and K.K. testified that they noticed the sexual activity between appellant and M.W. at the hotel, but declined to interfere because, at the time, they thought the activity was consensual. In fact, both K.K. and D.C. testified that they heard M.W. moan, and the moaning seems to be more consistent with consensual sexual activity rather than a situation where M.W. was physically helpless. The record further reflects that M.W.'s tests for the three common date-rape drugs all came back negative, and all the witnesses testified that M.W. did not seem to be intoxicated. Indeed, even M.W. testified that she felt more tired than intoxicated. Thus, notwithstanding M.W.'s testimony, the record contains substantial evidence that appears to support appellant's claim that he did not know or have reason to know that M.W. was physi-

cally helpless or that their sexual activity was nonconsensual.

■ However, the language cited by appellant from *Ani* is mere dictum. *State v. Folley*, 378 N.W.2d 21, 25 (Minn.App. 1985). The present state of the law in Minnesota is that a complainant's testimony need not be corroborated in a prosecution for criminal sexual conduct. *See State v. Halvorson*, 506 N.W.2d 331, 335–36 (Minn.App.1993) (holding testimony of a 19–year–old victim of criminal sexual conduct was sufficient for the jury to believe her story over that of the defendant); *State v. Haala*, 415 N.W.2d 69, 79 (Minn. App.1987) (holding ten-year-old's unequivocal testimony about her father touching her was sufficient to convict him for second-degree criminal sexual conduct despite his claim that the story was fabricated), *review denied* (Minn. Dec. 22, 1987).

■ Here, there is sufficient evidence to support appellant's conviction. M.W. testified at trial that she was not flirting with appellant on the night of the alleged sexual assault and claimed that she was not attracted to appellant. J.S. agreed that M.W. had not been flirting with appellant, and opined that appellant was not her "type." M.W. also testified that after the group returned to the hotel, she went to bed because she was feeling very tired. M.W. further testified that she woke up with her pajama pants and underwear off one leg, and her tampon on the floor, but claimed that she did not remember having sex and did not consent to sex with appellant. If believed, this evidence is, though uncorroborated, sufficient to sustain appellant's conviction. In deference to the jury, we must conclude that the jury believed M.W.'s testimony and disbelieved appellant's testimony. *See Wedan v. State*, 409 N.W.2d 266, 268 (Minn.App.1987) (stating that ascertaining witness credibility is the jury's province, and this court defers to

the jury's credibility determinations), *review denied* (Minn. Sept. 23, 1987). We recognize that the record to support the conviction is thin, but because credibility is an overriding consideration, there is sufficient evidence to support appellant's conviction of third-degree criminal sexual conduct.

## II. Pre-arrest silence

■ Prior to trial, appellant sought to preclude testimony concerning his pre-arrest silence. The district court reserved its ruling but revisited the issue at trial when the state, in its case-in-chief, sought to introduce testimony that Sergeant Scott Niemeyer received no response to a letter he sent to appellant asking to speak with him concerning M.W.'s allegations. The state also sought to introduce testimony that Sergeant Niemeyer later called appellant, who indicated that he did not want to speak and invoked his right to counsel. The district court allowed testimony that Sergeant Niemeyer mailed appellant a letter and received no response but did not permit the state to elicit evidence in its case-in-chief that Niemeyer called appellant and that appellant invoked his right to counsel. The court also ruled that if appellant testified, the state could question him about the phone call with Sergeant Niemeyer.

■ Appellant argues that the district court abused its discretion in allowing Sergeant Niemeyer to testify that he attempted to communicate with appellant by mail but received no response. "Evidentiary rulings rest within the sound discretion of the [district] court and will not be reversed absent a clear abuse of discretion. On appeal, the appellant has the burden of establishing that the [district] court abused its discretion and that appellant was thereby prejudiced." *State v. Amos*, 658 N.W.2d 201, 203 (Minn.2003) (citations

omitted). If the ruling involves constitutional error, however, the court must look to whether the error was harmless "beyond a reasonable doubt." *State v. Richardson,* 670 N.W.2d 267, 277 (Minn.2003). The error is not harmless "beyond a reasonable doubt" if there is a reasonable possibility that it contributed to the conviction. *Id.* (quotation omitted).

■ Both the United States and Minnesota constitutions guarantee a criminal defendant the right to remain silent. U.S. Const. amend. V; Minn. Const. art. I, § 7. Because exercising this right may be erroneously interpreted as an admission of guilt, admitting evidence of a defendant's silence could deprive the defendant of a fair trial. *Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976). Thus, a prosecutor's reference to a defendant's post-arrest, post-*Miranda* silence has been deemed a violation of due process because it commented on the defendant's exercise of a constitutional right. *Id.*

However, the Supreme Court held in *Fletcher v. Weir,* that post-arrest, pre-*Miranda* silence could be admitted on cross-examination to impeach. 455 U.S. 603, 607, 102 S.Ct. 1309, 1312, 71 L.Ed.2d 490 (1982). The Supreme Court has also held that pre-arrest, pre-*Miranda* silence was properly admissible on cross-examination. *Jenkins v. Anderson,* 447 U.S. 231, 238–39, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86 (1980). In Minnesota, our supreme court has held that counseled, pre-*Miranda* silence is constitutionally protected and cannot be used for impeachment. *State v. Billups,* 264 N.W.2d 137, 139 (Minn.1978). And in *State v. Dunkel,* this court applied *Billups,* to hold that the use of "counseled, pre-arrest, pre-*Miranda* silence in the state's case-in-chief was erroneous." 466 N.W.2d 425, 428 (Minn.App.1991).

Relying on *Dunkel,* appellant argues that the district court abused its discretion in allowing the officer to comment on his failure to reply to the letter. But *Dunkel* is distinguishable from the fact situation here because the pre-arrest silence discussed in *Dunkel* was counseled silence. *Id.* In contrast, the challenged testimony here was specifically limited to pre-counseled, pre-arrest, and pre-*Miranda* silence. Thus, the issue before us is whether pre-counseled, pre-arrest, and pre-*Miranda* silence is admissible in the state's case-in-chief. This is an issue that has not been definitively decided by the Minnesota Supreme Court. *See State v. Jones,* 753 N.W.2d 677, 688–89 (Minn.2008) (holding that admission of the defendant's pre-arrest silence before the defendant testified was not plain error because neither the Minnesota Supreme Court nor the federal courts have conclusively resolved the issue).

The state urges us to follow the Eight Circuit's reasoning in *United States v. Frazier,* 408 F.3d 1102 (8th Cir.2005). In that case, the Eighth Circuit Court of Appeals held that testimony elicited by the government during its case-in-chief concerning defendant's silence during and immediately after arrest, but before *Miranda* warnings were given, did not violate the defendant's Fifth Amendment right against self-incrimination. *Frazier,* 408 F.3d at 1111. The court held that "[a]lthough [the defendant] was under arrest, there was no governmental action at that point inducing his silence." *Id.*

We agree that the reasoning in *Frazier* is compelling. If, under *Frazier,* the defendant's post-arrest silence was admissible, then appellant's pre-arrest silence here would also be admissible. *See id.* But there is a conflict of authority on the question presented in *Frazier.* 408 F.3d at 1110. For example, the Ninth and Sev-

enth Circuit Courts of Appeals have recognized that because the right to remain silent derives from the Constitution and not from the *Miranda* warning, commenting on a defendant's pre-*Miranda* invocation of his right to silence violates the Fifth Amendment. *United States v. Velarde–Gomez*, 269 F.3d 1023, 1029 (9th Cir. 2001) (en banc); *see also United States v. Hernandez*, 948 F.2d 316, 323 (7th Cir. 1991) (excluding the introduction of impeaching evidence of silence during the prosecutor's case-in-chief). Conversely, the Eleventh Circuit Court of Appeals concluded that the government may comment on a defendant's silence if the silence occurred before *Miranda* warnings are given. *United States v. Rivera*, 944 F.2d 1563, 1567–68 (11th Cir.1991).

We conclude that the reasoning of the Ninth and Seventh Circuit Courts of Appeals is persuasive. Because the right to remain silent derives from the Constitution and not from the *Miranda* warning, commenting on a defendant's silence in response to police questions or attempts to pose questions deprives the defendant of his due-process right to a fair trial. This reasoning is consistent with this court's decision in *Dunkel*, which held that the use of "counseled, pre-arrest, pre-*Miranda* silence in the state's case-in-chief was erroneous." 466 N.W.2d at 428. We see no reason why *Dunkel* should be distinguished on the basis that appellant's silence was pre-counseled. Such a distinction would vitiate a criminal defendant's constitutional guarantee of the right to remain silent. We therefore conclude that the district court erred in permitting the officer to testify about appellant's pre-counseled, pre-arrest, and pre-*Miranda* silence in the state's case-in-chief.

 The state argues that even if the district court erroneously admitted the officer's testimony concerning appellant's pre-arrest silence, the error was harmless beyond a reasonable doubt. We disagree. As discussed above, the state did not have a strong case. The case turned largely on witness credibility, and much of the witness testimony supported appellant's defense that M.W. willingly and consciously engaged in sexual intercourse with him. Accordingly, in light of the weaknesses in the state's case, we do not consider the erroneous admission of the challenged testimony to be harmless beyond a reasonable doubt. Because appellant's conviction is reversed and the case remanded for proceedings consistent with this opinion, we need not address appellant's remaining arguments.

### DECISION

In this strongly contested and close case, the district court's admission of the officer's testimony about appellant's pre-counseled, pre-arrest, and pre-*Miranda* silence was erroneous, and the error was not harmless beyond a reasonable doubt. Therefore, we reverse and remand.

**Reversed and remanded.**