# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3442

_____

United States of America,　　　　*
　　　　　　　　　　　　　　　　*
　　　　　Plaintiff-Appellee,　　*
　　　　　　　　　　　　　　　　*　　Appeal from the United States
　　　　v.　　　　　　　　　　　*　　District Court for the
　　　　　　　　　　　　　　　　*　　District of Nebraska.
Jose Osuna-Zepeda,　　　　　　　*
　　　　　　　　　　　　　　　　*　　　　　[PUBLISHED]
　　　　　Defendant-Appellant.　*

_____

Submitted:　March 14, 2005
　　　Filed:　August 5, 2005 (corrected 8/11/05)

_____

Before WOLLMAN, LAY, and HANSEN, Circuit Judges.

_____

HANSEN, Circuit Judge.

A jury convicted Jose Osuna-Zepeda of conspiracy to distribute at least 50 grams and less than 500 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1) and 846 (2000). The district court[1] sentenced him to sixty-three months of imprisonment and four years of supervised release. Osuna-Zepeda appeals. After careful review, we affirm the judgment of the district court.

_____

[1] The Honorable Laurie Smith Camp, United States District Judge for the District of Nebraska.

## I.

The evidence presented at trial showed that from February 2003 to October 2003, Osuna-Zepeda conspired with two other individuals to sell methamphetamine. In October 2003, the Omaha, Nebraska, Police Department received a tip from a confidential source that Richard Meehan would be at a Target store in Omaha to meet with his methamphetamine supplier, an unidentified Hispanic male. Officer Gary Kula arrived at the store, located Meehan's automobile, and followed Meehan into the store. Using the store's security system, Officer Kula observed Meehan talking to a man later identified as Javier Padilla-Armenta. The store's video surveillance also showed Osuna-Zepeda standing behind Meehan and Padilla-Armenta. Meehan and Padilla-Armenta moved to a place where they could not be seen by the cameras, where they exchanged $900 for a quantity of methamphetamine. Osuna-Zepeda did not accompany them. Assuming that the transaction had occurred off-camera, several Omaha officers pursued all three men. The officers arrested Meehan as he tried to get into his car, and the officers observed several grams of methamphetamine at the time. Inside the store, the officers also located and arrested Padilla-Armenta and Osuna-Zepeda. All three men were taken to the Target security room, where Osuna-Zepeda consented to a search of his person. The officers found $89, lip balm, a cross, and a passport in Osuna-Zepeda's pocket.

Osuna-Zepeda was indicted along with Meehan and Padilla-Armenta, but both of his codefendants pleaded guilty before Osuna-Zepeda's trial began. Padilla-Armenta pleaded guilty in March 2004 and was sentenced before Osuna-Zepeda's trial. The week before Osuna-Zepeda's trial, Meehan pleaded guilty. At trial in June 2004, Meehan testified that he had purchased drugs from Padilla-Armenta numerous times between the summer of 2002 and October 31, 2003, including three transactions at Target in September and October 2003. He also testified that Osuna-Zepeda was present on every occasion that Meehan met with Padilla-Armenta to arrange a methamphetamine purchase. Meehan told the court that during the typical transaction he would speak to Padilla-Armenta in English, and then Padilla-Armenta would

converse with Osuna-Zepeda in Spanish before turning back to Meehan and responding in English. Meehan did not speak with Osuna-Zepeda directly. However, according to Meehan, it appeared that whenever quantity or price was an issue during a transaction, Padilla-Armenta would turn to Osuna-Zepeda and converse in Spanish. From these transactions, Meehan had the impression that the negotiations were not controlled by Padilla-Armenta. Meehan admitted that he hoped to get a downward departure for cooperating with the United States Attorney and testifying against Osuna-Zepeda.

Padilla-Armenta testified that, as far as he knew, Osuna-Zepeda had never been in the United States before October 2003 and stated that Osuna-Zepeda had not been involved in the methamphetamine conspiracy. On cross-examination, the AUSA questioned Padilla-Armenta about his failure to inform the court or the government at any time before trial that Osuna-Zepeda had not been involved. Osuna-Zepeda's counsel then presented evidence and testimony that Padilla-Armenta had stated in a sworn deposition in December 2003 that Osuna-Zepeda was innocent. While the AUSA had not attended the deposition, she had received a copy of the deposition transcript in January 2004, at least five months before the trial. In fact, she later furnished a copy of it to Osuna-Zepeda's new counsel when he entered the case, and she had identified the transcript as a potential government exhibit in a pre-trial filing with the court. The deposition of Padilla-Armenta had been taken by Osuna-Zepeda's prior counsel. There is no showing in the record that the government was noticed of the deposition prior to its taking.

Officer Gary Kula testified for the government. The AUSA asked Kula, "at any time in this Target security room do the individuals make any statements to you?" (Trial Tr. at 50.) Osuna-Zepeda's counsel objected to the question, arguing that the statement was in violation of Osuna-Zepeda's Fifth Amendment rights. The district court overruled the objections. Officer Kula responded that none of the arrestees

made a statement after being taken into custody in the Target security room. (Id. at 50.) The district court denied the defense's motion for a mistrial.

Osuna-Zepeda moved to dismiss the charges, claiming that the prosecution had failed to establish a prima facie case because the evidence of Osuna-Zepeda's mere presence at several drug transactions was not enough to implicate him in the conspiracy. The court denied the motion, agreed that a "mere presence" jury instruction would be given, and otherwise found that there was enough evidence to submit the case to the jury. After trial, the district court denied Osuna-Zepeda's motion for a new trial or an alternative judgment of acquittal. On appeal, Osuna-Zepeda argues that the jury verdict was not supported by sufficient evidence, that the admission of testimony establishing that Osuna-Zepeda had not made a postarrest, pre-Miranda statement violated his Fifth Amendment rights, and that the district court erred in denying his motion for a new trial.

## II.

Osuna-Zepeda's first argument is that the evidence was insufficient to support his conviction because it consisted primarily of the uncorroborated testimony of Meehan, who was a felon, a cooperating conspirator, and had entered a guilty plea days before the trial. Osuna also claims that the evidence was insufficient because no methamphetamine was found in his possession. We review challenges to the sufficiency of the evidence de novo, viewing the facts in the light most favorable to the verdict, resolving any evidentiary conflicts in favor of the prosecution, and accepting all reasonable inferences that support the verdict. United States v. Causor-Serrato, 234 F.3d 384, 387-88 (8th Cir. 2000), cert. denied, 532 U.S. 1072 (2001). We will uphold the verdict if we find that a reasonable jury could have found Osuna-Zepeda guilty beyond a reasonable doubt. Id. at 388.

In order to find Osuna-Zepeda guilty of conspiracy to distribute methamphetamine, the prosecution had to prove that (1) a conspiracy existed; (2)

Osuna-Zepeda was aware of the conspiracy; and (3) Osuna-Zepeda knowingly joined the conspiracy. Id. Osuna-Zepeda does not dispute that a conspiracy existed between Padilla-Armenta and Meehan. Instead, he appears to deny that he was aware of the conspiracy or that he knowingly joined the conspiracy.

We conclude that sufficient evidence supports the jury verdict. In this case, Meehan's testimony, coupled with the corroboration that the Target surveillance tapes provided, permitted a reasonable inference that Osuna-Zepeda was involved in the conspiracy. Where the prosecution has established that a conspiracy existed, only slight evidence is required to link a defendant to the conspiracy, and therefore a defendant challenging a conspiracy conviction based on an alleged insufficiency of the evidence faces a heavy burden. Id.; see also United States v. Padilla-Pena, 129 F.3d 457, 464-65 (8th Cir. 1997), cert. denied, 524 U.S. 905, and cert. denied, 524 U.S. 906 (1998). Furthermore, a conviction for involvement in a conspiracy may rest on indirect or circumstantial evidence. United States v. Jackson, 204 F.3d 812, 814 (8th Cir. 2000). Osuna-Zepeda suggests that Meehan's status as a felon and the fact that he pleaded guilty preclude his testimony from constituting reliable evidence. We disagree. Meehan's credibility was an issue for the jury to decide. Id.; United States v. Lopez, 42 F.3d 463, 466 (8th Cir. 1994) (noting that it was the province of the jury to weigh a witness's credibility, even where the witness was a paid informant). The jury was aware that Meehan had several felony convictions and that he had signed a plea agreement with the government in which he had promised to cooperate.

Osuna-Zepeda's arguments based on United States v. Carper, 942 F.2d 1298, 1302 (8th Cir.), cert. denied, 502 U.S. 993 (1991), are unpersuasive. In that case, defendants Michael Carper and Juliette Stark were convicted of conspiracy to distribute methamphetamine. On appeal, we reversed Stark's conviction, agreeing with Stark that her conviction was not supported by sufficient evidence. We stated that "[t]here [was] evidence that Carper and Juliette associated, but there [was] not enough evidence linking this association to drugs." Id. We reasoned that the

evidence that Carper and Juliette Stark knew each other and had been seen together was not sufficient because there was no evidence from which it might have been inferred that Carper was Juliette Stark's unnamed drug source. Id. Osuna-Zepeda's case is not comparable to Carper. In Carper, despite all of the evidence that Carper and Stark dealt methamphetamine individually, there was no evidence that they dealt with each other – there was no mention in the case that Carper and Stark were ever both present at the same drug-related transaction. In this case, there is evidence that Osuna-Zepeda was with Padilla-Armenta during numerous drug transactions, and that he was involved in the dealing.

In our opinion, the facts of this case are more similar to Causor-Serrato, 234 F.3d at 386-87. A jury convicted defendant Causor-Serrato of conspiracy to distribute methamphetamine, after a law enforcement agent made an undercover buy that resulted in the arrests of two people, Gregory Wendt and Kim Mancini. Id. at 386. Wendt and Mancini told the police that their source of methamphetamine was a man named Sanchez-Ramirez. Id. at 386-87. Subsequently, in March 1998, the agent arranged an undercover buy with Sanchez-Ramirez. While the drug transaction took place, Causor-Serrato, waited in his truck for Sanchez-Ramirez. Id. at 387. At a second undercover buy in April 1998, Causor-Serrato was again present, waiting for Sanchez-Ramirez. After Causor-Serrato and Sanchez were arrested, Causor-Serrato denied having any knowledge that drug deals had occurred, and he challenged his conviction based on an alleged insufficiency of the evidence. He argued that his inability to speak English precluded his participation in the conspiracy, and that his mere presence was not enough to establish his guilt. Id. at 388. On appeal, we rejected Causor-Serrato's arguments. First, there was testimonial evidence that whenever the agent spoke to Sanchez-Ramirez to arrange a meth buy, Sanchez-Ramirez would turn to Causor-Serrato and converse in Spanish before responding to the agent in English to confirm the deal. Id. at 388. We held that "[c]ertainly a reasonable jury could infer from this colloquy that Causor-Serrato was actively participating in the drug sales as a principal supplier, using Sanchez-Ramirez as a

middleman/translator."  Id.  We also noted that the evidence showed that Causor-Serrato, like Osuna-Zepeda, always accompanied his coconspirator during at least part of the transaction.  Id.  As to the mere presence argument, we noted that "only slight evidence connecting a defendant to the conspiracy may be enough to sustain a conviction," id., and concluded that, considering all of the evidence, the government had "well surpassed the threshold" to link Causor-Serrato to the conspiracy, id. at 389.  Like Causor-Serrato, the evidence connecting Osuna-Zepeda to the conspiracy is enough to sustain his conviction.

Osuna-Zepeda also contests the admission of Meehan's testimony that Meehan had not believed that Padilla-Armenta was the individual who was "calling the shots" during their methamphetamine deals.  During trial, the district court did not allow Meehan to testify that he concluded that it was Osuna-Zepeda who was in fact in charge, because the court deemed such testimony an improper conclusion.  However, the court did permit Meehan to testify that  he got the impression that Padilla-Armenta was not calling the shots.  (Trial Tr. at 92-93.)  Osuna-Zepeda calls these rulings inconsistent, but we disagree.  It was for the jury as the fact finder, not Meehan, to determine who was in charge of the drug transactions.  By permitting Meehan to testify that he had not felt that Padilla-Armenta was in charge, the jury was still left to make the ultimate conclusion that it was Osuna-Zepeda, instead, who was in charge.

Osuna-Zepeda also suggests that the fact that no methamphetamine was found on him indicates that he was not involved in the conspiracy.  We disagree.  He was not charged with possession of methamphetamine, he was charged with conspiracy to distribute methamphetamine.  Possession of the narcotic is not a necessary element of the crime of conspiracy to distribute.  See Causor-Serrato, 234 F.3d at 388 (elements of the offense); United States v. Colon, 268 F.3d 367, 375-76 (6th Cir. 2001) (stating that defendant need not be found in possession of narcotics in order to be found guilty of conspiracy to distribute).

-7-

## III.

Osuna-Zepeda next argues that it was error for the AUSA to inquire whether Osuna-Zepeda made a statement at the time of his arrest. Osuna-Zepeda insists that such a comment on his failure to make a statement violated his Fifth Amendment right to remain silent, and that the AUSA committed prosecutorial misconduct by eliciting such testimony from the witness.

Osuna-Zepeda had been arrested and taken into custody, but he was not read his Miranda[2] rights until he was taken to the police station. The issue here is "whether the use of [Osuna-Zepeda's] postarrest, pre-Miranda silence during the government's case-in-chief was constitutional." See United States v. Frazier, 408 F.3d 1102, 1109 (8th Cir. May 31, 2005). In Frazier, the prosecution presented evidence at Frazier's trial that he did not make a statement to the police at the time of his arrest. Id. at 1107. The district court overruled Frazier's objection to the testimony, concluding that the testimony did not violate his Fifth Amendment rights. Deciding an issue of first impression, we agreed with the district court. After discussing related cases in other circuits, we held in Frazier that the use of postarrest, pre-Miranda silence in a prosecution's case-in-chief was not unconstitutional. Id. at 1109-11.

> [T]he more precise issue is whether Frazier was under any compulsion to speak at the time of his silence. He was not. Although Frazier was under arrest, there was no governmental action at that point inducing his silence. Thus he was under no government-imposed compulsion to speak. It is not as if Frazier refused to answer questions in the face of interrogation. We are speaking in this case only of the defendant's silence during and just after his arrest. As noted earlier, an arrest by itself is not governmental action that implicitly induces a defendant to remain silent.

---

[2]Miranda v. Arizona, 384 U.S. 436 (1966).

Id. at 1111. Osuna-Zepeda's case is not factually distinguishable from Frazier. As in Frazier, when Osuna-Zepeda was arrested "there was no governmental action at that point inducing his silence," and Osuna-Zepeda "was under no government-imposed compulsion to speak." Id. Likewise, the case concerned only Osuna-Zepeda's "silence during and just after his arrest." Id. Furthermore, because the use of the testimony did not violate the Fifth Amendment, the AUSA did not commit prosecutorial misconduct by eliciting the testimony.

## IV.

Finally, Osuna-Zepeda argues that the district court erred in denying his motion for a new trial on the ground that the AUSA's cross-examination of Padilla-Armenta prejudiced the trial.[3] The AUSA's cross-examination of Padilla-Armenta implied that Padilla-Armenta had made no attempt to declare Osuna-Zepeda's innocence before trial, despite the fact that the AUSA was aware that Padilla-Armenta had attempted to exonerate Osuna-Zepeda in a deposition taken months before trial. Osuna-Zepeda insists that the AUSA intentionally misrepresented the facts – when Padilla-Armenta first asserted Osuna-Zepeda's innocence – in order to mislead the jury, and that this conduct was a violation of a duty of disclosure or candor. In denying the motion, the district court found that "lead counsel for the government struck no foul blow [and] committed no ethical breach." (J.A. at tab 6.)

Prosecutorial misconduct such as that alleged here can serve as a ground for a new trial if the conduct "was improper and prejudicial enough to deprive the defendant of a fair trial," thus violating the defendant's constitutional right to Due Process. United States v. Thropay, 394 F.3d 1004, 1007 (8th. Cir.), petition for cert. filed, No. 04-9617 (U.S. Apr. 6, 2005). We review for abuse of discretion a district

---

[3]Although Osuna-Zepeda's appellate brief also mentions a motion for a mistrial, we agree with the government that Osuna-Zepeda never moved for a mistrial on this ground. The only motion for a mistrial that was made in this case was after Officer Kula testified about Osuna-Zepeda's postarrest, pre-Miranda silence.

court's denial of a motion for a new trial.  Id.  While we do not advocate or condone the AUSA's conduct, we nevertheless conclude that the district court did not abuse its discretion by denying Osuna-Zepeda's motion.  Because the prosecution never explicitly denied before the jury that it was aware of the deposition, and because the deposition was ultimately admitted into evidence and seen by the jury, Osuna-Zepeda's substantial rights were not affected and he was not denied a fair trial.  Considering not only the alleged misconduct, but also the totality of the evidence and the conduct of the trial overall, Osuna-Zepeda has not shown that any alleged error "fatally infected" his trial or resulted in a miscarriage of justice.  See United States v. LaFuente, 54 F.3d 457, 462 (8th Cir.), cert. denied, 516 U.S. 902 (1995); see also Smith v. Phillips, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.").

For the reasons stated, we affirm the judgment of the district court.

LAY, Circuit Judge, concurring.

Although I concur in the judgment of the court, I write separately because I believe Osuna-Zepeda's Fifth Amendment right to remain silent was violated when, as part of its case-in-chief, the government elicited comments from the arresting officer regarding Osuna-Zepeda's silence after he was arrested but before he received a Miranda warning.  While this panel must follow United States v. Frazier, 408 F.3d 1102, 1109-11 (8th Cir. 2005), I note that Frazier is contrary to the clear trend emerging from the circuits on this issue and, in my opinion, contrary to the Fifth Amendment of the Constitution.  I suggest "the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."  Griffin v. California, 380 U.S. 609, 615 (1965) (footnote omitted).

The <u>Frazier</u> opinion holds that a criminal defendant under custodial arrest cannot suffer a violation of his right to remain silent because he is not exposed to an official compulsion to speak sufficient to trigger Fifth Amendment protection. 408 F.3d at 1111. In reviewing Osuna-Zepeda's Fifth Amendment claim, it is important to remember that the only reason the government offered the arresting officer's testimony regarding Osuna-Zepeda's silence was to plant the following seed with the jury: An innocent person would have instinctively responded to arrest by objecting or otherwise protesting his innocence; since Osuna-Zepeda did not say anything, you should infer that he is guilty.

Using an arrested person's silence as evidence of guilt in the government's case-in-chief presents many problems. As an evidentiary matter, silence in this case lacked probative value because the jury could not infer with adequate reliability why Osuna-Zepeda, when faced with custodial arrest, remained silent. <u>See</u> <u>United States v. Hale</u>, 422 U.S. 171, 180 (1975) (holding silence during a post-<u>Miranda</u> custodial interrogation lacked probative value). A person standing mute in the face of a custodial arrest may be consciously invoking the right to remain silent, calmly executing a pre-planned response to arrest, or not making any conscious response at all. Accordingly, the appropriate conclusion is that silence is "insolubly ambiguous." <u>Doyle v. Ohio</u>, 426 U.S. 610, 617-18 & n.8 (1976) (stating post-<u>Miranda</u> silence lacks probative value); <u>see also</u> <u>Hale</u>, 422 U.S. at 180 ("Not only is evidence of silence at the time of arrest generally not very probative of a defendant's credibility, but it also has a significant potential for prejudice."). The fact that Osuna-Zepeda did not speak English only added to the ambiguity. Even if he understood the arresting officer, he may have stood mute because he lacked sufficient ability to articulate a protest of his innocence in English. Under these facts, it was rank speculation to conclude that his silence demonstrated guilt.

Using evidence of pre-<u>Miranda</u> silence also raises Fifth Amendment concerns. By focusing on what official acts <u>trigger</u> the right to remain silent, <u>Frazier</u> ignores

that a pre-trial defendant can <u>invoke</u> his right to remain silent.  As part of the broad construction of the right to remain silent, the Supreme Court has emphasized that "no ritualistic formula is necessary in order to invoke the privilege."  <u>Quinn v. United States</u>, 349 U.S. 155, 164 (1955).  Standing mute invokes the privilege. <u>See Miranda v. Arizona</u>, 384 U.S. 436, 468 n.37 (1966) ("The prosecution may not . . . use at trial the fact that [the defendant] <u>stood mute</u> or claimed his privilege in the face of accusation.") (emphasis added).  Likewise, <u>Frazier</u> gives short-shrift to the many contexts in which the privilege applies.  Even though the privilege against self-incrimination is technically a trial right, the Supreme Court has recognized that "an inability to protect the right at one stage of a proceeding may make its invocation useless at a later stage."  <u>Michigan v. Tucker</u>, 417 U.S. 433, 440-41 (1974).  Accordingly, Fifth Amendment protection applies broadly in a variety of pretrial settings.  <u>See Kastigar v. United States</u>, 406 U.S. 441, 444-45 (1972) ("It can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.") (footnote omitted).

More importantly, I very much doubt that we would allow the government to use in its case-in-chief an arrested suspect's statement to the effect of "I wish to exercise my right to remain silent," or "I want to talk to my lawyer."  If we will not allow use of the statement "I exercise my right to remain silent under the Fifth Amendment" to prove the defendant's guilt, we should not allow silence to prove guilt.  For purposes of the Fifth Amendment, silence is the same as a statement invoking the right to remain silent. <u>Fields v. Leapley</u>, 30 F.3d 986, 990 (8th Cir. 1994) (citing <u>Wainwright v. Greenfield</u>, 474 U.S. 284, 295 n.13 (1986)).  We should treat it the same.

Lastly, refusing Osuna-Zepeda the right to remain silent when he was arrested fundamentally contradicts the government's logic for using his silence as evidence

of his guilt. At trial, the government relied on the premise that an innocent person would instinctively speak out when arrested; now on appeal, the court concludes that Osuna-Zepeda deserves no protection under the Fifth Amendment because he did not face an official compulsion to speak. I suggest that if an arrested person would feel an instinctive urge to protest his innocence, he has experienced an official compulsion to speak sufficient to trigger the right to remain silent.

I note that Frazier is contrary to the clear majority of circuits that recognize a general Fifth Amendment prohibition against using a defendant's pre-Miranda silence as evidence of guilt. Compare United States v. Whitehead, 200 F.3d 634, 639 (9th Cir. 2000) (admitting "evidence of [defendant's] post-arrest, pre-Miranda silence . . . plainly infringed upon [defendant's] privilege against self-incrimination") (no interrogation or questioning by arresting officer); United States v. Moore, 104 F.3d 377, 385 (D.C. Cir. 1997) (finding Fifth Amendment violation when government commented on defendant's pre-Miranda silence during closing because "custody and not interrogation is the triggering mechanism for the right of pretrial silence under Miranda") (no police questioning); United States v. Hernandez, 948 F.2d 316, 323 (7th Cir. 1991) (finding comments during the government's case-in-chief regarding the defendant's refusal to speak with arresting officers violated the defendant's right to remain silent) (no police questioning); United States v. Caro, 637 F.2d 869, 876 (2d Cir. 1981) (holding that using the defendant's pre-Miranda silence as evidence of guilt violated the Fifth Amendment) (no police questioning); with Combs v. Coyle, 205 F.3d 269, 283 (6th Cir. 2000) (holding that "use of a defendant's prearrest silence as substantive evidence of guilt violates the Fifth Amendment's privilege against self-incrimination") (minimal police questioning); and United States v. Burson, 952 F.2d 1196, 1201 (10th Cir. 1991) (finding that admission of evidence of defendant's refusal to answer questions prior to arrest or Miranda warnings violated his right to remain silent) (non-custodial questioning); Coppola v. Powell, 878 F.2d 1562, 1565 (1st Cir. 1989) (stating the right to remain silent attaches prior to initiation of adversarial proceedings and use of pre-arrest silence as evidence of guilt violated the

Fifth Amendment) (non-custodial questioning). But see United States v. Zanabria, 74 F.3d 590, 593 (5th Cir. 1996) (holding no violation because the Fifth Amendment only protects against compelled statements and arrested defendant was not compelled to speak); United States v. Rivera, 944 F.2d 1563, 1568 (11th Cir. 1991) (finding no due process violation when the government comments "on a defendant's silence when it occurs after arrest, but before Miranda warnings are given"); and United States v. Love, 767 F.2d 1052, 1063 (4th Cir. 1985) (finding no constitutional violation when government referred to defendant's post-arrest, pre-Miranda silence).

I respectfully submit Frazier was wrongly decided. Accordingly, this case before us merits en banc rehearing to allow the full court to examine the critical Fifth Amendment issue at stake.

_____