# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-2054

_____

United States of America,

*Plaintiff - Appellee*,

v.

Terry L. Schwarck,

*Defendant - Appellant*.

_____

Appeal from United States District Court
for the District of Nebraska - Lincoln

_____

Submitted: December 13, 2012
Filed: June 28, 2013

_____

Before LOKEN, BRIGHT, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

A jury convicted Terry Schwarck of conspiracy to distribute and possess with intent to distribute 500 grams or more of a mixture or substance containing methamphetamine, in violation of 21 U.S.C. § 846. The district court[1] sentenced him

_____

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

to 240 months' imprisonment. Schwarck appeals, arguing that the court abused its discretion at trial by admitting expert testimony regarding the distribution of methamphetamine. We affirm.

I.

On March 28, 2011, Melissa Ripley, an undercover officer from the Lincoln, Nebraska, Police Department, arrested Terry Schwarck after an investigation into methamphetamine trafficking. During a search of Schwarck's vehicle incident to the arrest, officers found a pouch containing a radio frequency detector, a money clip with four one-hundred dollar bills, an address book, and a cigarette case with hand-rolled cigarettes. A grand jury charged Schwarck with conspiracy to distribute and possess with intent to distribute 500 grams or more of methamphetamine, and the case proceeded to trial.

Schwarck's defense was that he was not a drug dealer, but merely a drug addict with a party house who engaged in small drug transactions to support his personal use. Investigator Ripley testified for the prosecution about her undercover investigation. She twice purchased methamphetamine from a Christine Snyder. On the second occasion, Ripley drove Snyder to Schwarck's residence and waited outside while Snyder went inside and obtained methamphetamine. On October 5, 2010, Snyder—then working as a confidential informant—introduced Ripley to Schwarck in the basement of Schwarck's residence. Ripley gave Schwarck money for drugs in an office area at the bottom of the basement stairs, and Schwarck said that he would get methamphetamine for her from another location. During the transaction, Ripley saw a scale sitting on the desk next to a surveillance video monitor. Ripley left Schwarck's residence and dropped off Snyder. She then equipped herself with a recording device and returned to Schwarck's residence. Schwarck gave Ripley a small plastic bag containing a quarter-ounce of methamphetamine and invited Ripley to return if she wanted to buy more drugs.

Ripley testified that she returned to Schwarck's residence six days later to attempt to purchase an eighth-ounce of methamphetamine. Ripley gave Schwarck $340 and arranged to meet him later that day outside a store to pick up the drugs. When Ripley, wearing a recording device, arrived at the meeting place and entered Schwarck's vehicle, he pulled out a radio frequency detector. The detector was flashing and beeping to indicate the possible presence of a recording device. Ripley tried to convince Schwarck that she was not wearing a recorder, but Schwarck refused to furnish the drugs unless she disrobed to show that she was unequipped. When Ripley said she was unwilling to do so, Schwarck gave her a refund, but he did not return the same bills that she had provided. Instead, he gave her bills in larger denominations, including one-hundred dollar bills.

At trial, Ripley also explained the physical layout of Schwarck's basement. There was a living area, an office area under the stairs where one meeting between Ripley and Schwarck occurred, and a room with a bed that was partitioned off from the living area by a curtain or sheet. On both of her visits to the residence, Ripley saw a monitor in the office area that displayed images from surveillance cameras that were located outside the residence. Ripley also testified that she saw people on a bed in the partitioned room on her second visit.

The government called Sergeant William Koepke of the Lincoln/Lancaster County Drug Unit as an expert to discuss the distribution of methamphetamine in the Lincoln area and the *modus operandi* of drug dealers. Koepke was a twenty-year officer with ten years of experience in the narcotics unit, where he supervised other officers, interviewed more than 1,000 drug traffickers, and conducted surveillance of undercover narcotics operations. Koepke also attended training seminars and was a certified instructor on drug investigations.

Koepke testified that drug traffickers may try to insulate themselves from law enforcement by enlisting a trusted helper to deliver drugs or to collect money when

dealing with unfamiliar buyers. Drug dealers also use security cameras to protect their business from law enforcement or dangerous individuals, and radio frequency detectors to determine whether a person is wearing a wireless transmitter that may be monitored by law enforcement. According to Koepke, the use of a radio frequency detector and the refusal to sell drugs to an individual who sets off the detector is consistent with the behavior of those who distribute methamphetamine. Koepke testified that he had never encountered a mere user of methamphetamine who employed residential security cameras and a radio frequency detector.

Koepke explained that drug dealers who have been arrested previously for drug crimes tend to take greater precautions. A trafficker with that experience, he explained, may limit the quantity of drugs that he keeps on his person or at his residence, in order to limit potential liability in the case of a seizure. He testified that dealers sometimes keep larger quantities at other locations and send others to retrieve the drugs from those locations when they make a larger sale. A dealer commonly sells only smaller quantities of a gram or less to a new buyer until the parties develop mutual trust.

Koepke recounted that drug dealers commonly carry large amounts of currency that represent the proceeds of their sales. A dealer who handles larger amounts of drugs would carry one-hundred dollar bills, while dealers in smaller quantities or users typically would have five-, ten-, and twenty-dollar bills. Koepke explained that he would not expect a mere user of methamphetamine to pay for drugs using one-hundred dollar bills. He opined that potential benefits of distributing methamphetamine, in addition to financial gain, could include acquiring methamphetamine for personal use at a reduced price or for free, trading vehicle parts, securing free transportation, obtaining sexual favors, and making new friends.

Schwarck moved *in limine* to exclude Koepke's testimony on the ground that it was not relevant and that any probative value would be outweighed by unfair prejudice. The court allowed the testimony and overruled Schwarck's followup objections at trial. The jury convicted Schwarck, and the district court sentenced him to 240 months' imprisonment.

II.

Schwarck appeals the district court's admission of Koepke's expert testimony. Federal Rule of Evidence 702(a) permits expert testimony if the "witness's specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." *United States v. Spencer*, 700 F.3d 317, 321 (8th Cir. 2012) (internal quotation omitted). A district court may permit law enforcement officers to give expert testimony concerning the *modus operandi* of drug dealers, because most jurors are not familiar with the trade. *United States v. Molina*, 172 F.3d 1048, 1056 (8th Cir. 1999). A district court must balance the probative value of such testimony against its possible prejudicial effects. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993); Fed. R. Evid. 403. We review the decision to allow expert testimony for abuse of discretion. *United States v. Coleman*, 584 F.3d 1121, 1126 (8th Cir. 2009).

Schwarck likens Koepke's testimony to evidence of a drug courier profile, which this court has disallowed as substantive evidence because it involves nothing more than the introduction of investigative techniques that law enforcement officers use to identify potential drug couriers. *United States v. Carter*, 901 F.2d 683, 684 (8th Cir. 1990); *see also United States v. Hernandez-Cuartas*, 717 F.2d 552, 555 (11th Cir. 1983). But unlike impermissible courier profile evidence, Koepke's testimony was relevant to rebut Schwarck's defense that he was merely a drug user and not a trafficker. The testimony permissibly explained the significance of evidence that would not be familiar to average jurors with no previous exposure to

the drug trafficking business. *See United States v. Jeanetta*, 533 F.3d 651, 657-58 (8th Cir. 2008); *United States v. Ortega*, 150 F.3d 937, 943 (8th Cir. 1998); *United States v. Brown*, 110 F.3d 605, 610-11 (8th Cir. 1997).

Schwarck also complains that Koepke's testimony was cumulative, because other witnesses testified about the surveillance equipment, the radio frequency detector, and the practice of dealing smaller quantities of drugs to new customers. But none of the other witnesses explained the significance of these items or activities in the drug trade, or how drug conspiracies work in general. *See United States v. Rosa-Carino*, 615 F.3d 75, 81 (1st Cir. 2010). And if Koepke's testimony really had been cumulative, then it likely would have been harmless rather than unfairly prejudicial. *United States v. Demery*, 674 F.3d 776, 782 (8th Cir. 2011).

Schwarck alleges that Koepke's testimony also furthered an effort by the government to impugn Schwarck's character by implying that he sought sexual favors in exchange for supplying drugs. He points to Koepke's opinion that drug dealers sometimes collect "sexual favors," combined with Ripley's testimony about the partitioned room with a bed in the basement, and the prosecutor's closing argument that "Mr. Schwarck employs young women to do various things, recruit people, bring people over, make runs to get dope for him." Considered in the context of the entire trial, however, any allusion to possible sexual conduct by Schwarck was elliptical and too attenuated to prejudice him unfairly. No witness testified that Schwarck himself received sexual favors. Evidence and argument concerning the involvement of young women in Schwarck's conspiracy was based on events observed directly by witnesses to the crime. It was offered properly and without objection for purposes other than making sexual innuendo. Koepke's general testimony that sexual favors are one of several possible benefits accruing to drug traffickers was not unfairly prejudicial.

We discern no abuse of discretion in the district court's decision to permit Koepke's expert testimony. The evidence was relevant, and Schwarck has not

demonstrated that the testimony caused unfair prejudice that substantially outweighed its probative value.

* * *

The judgment of the district court is affirmed.

_____