# United States Court of Appeals
### For the Eighth Circuit

_____

No. 13-1660

_____

United States of America

*Plaintiff - Appellee*

v.

Jason Holmes

*Defendant - Appellant*

_____

No. 13-1661

_____

United States of America

*Plaintiff - Appellee*

v.

Juan Antonio Castaneda Rendon, also known as Tony

*Defendant - Appellant*

_____

Appeals from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: January 17, 2014
Filed: May 12, 2014

_____

Before GRUENDER, BENTON, and KELLY, Circuit Judges.

_____

BENTON, Circuit Judge.

A jury convicted Jason Lee Holmes and Juan Antonio Castaneda Rendon of conspiracy to possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846. They appeal, arguing that the district court[1] erred in admitting expert testimony on narco-saints. Holmes also argues that a limiting instruction should have been given on the narco-saint testimony, that there was insufficient evidence to sustain his conviction, and that the district court committed sentencing errors. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

I.

As the first witness, the government called Robert R. Almonte, the United States Marshal for the Western District of Texas, as an expert on the iconography of the Mexican drug underworld. He linked to drug trafficking several images and shrines in the home of Rendon and Christian Maldonado, a co-conspirator. Almonte's testimony focused on images of Jesús Malverde, a "narco-saint" hailed as a "Mexican Robin Hood." Almonte also testified that Malverde is a patron saint of the poor, noting that many not associated with drug trafficking have statues of Malverde. Almonte concluded that a statue is only one indication of drug activity.

Holmes and Rendon attack Almonte's testimony, arguing that the testimony was (a) given by an unqualified expert, (b) unreliable, (c) irrelevant, (d) unfairly prejudicial, and (e) improper "drug courier" profile evidence. This court reviews the

_____

[1]The Honorable James M. Moody, United States District Judge for the Eastern District of Arkansas.

district court's decision to admit expert testimony for abuse of discretion, according it substantial deference. **United States v. Roach**, 644 F.3d 763, 763-64 (8th Cir. 2008).

Almonte was properly qualified. A witness may be qualified by knowledge, skill, experience, training, or education. **Fed. R. Evid. 702**. For about a decade, Almonte studied the iconography of the Mexican drug underworld. He observed icons in hundreds of narcotics cases and traveled to numerous Mexican shrines. Almonte has self-published materials on the subject and has conducted law-enforcement trainings on recognizing it. The defendants emphasize Almonte's lack of formal education about narco-saint iconography, but that is not required under Rule 702. In drug cases, courts frequently admit expert testimony relating to the modus operandi of drug dealers, where the expert witness is a law-enforcement officer whose only qualification is experience in the field. *See, e.g.*,**United States v. Schwarck**, 719 F.3d 921, 923-24 (8th Cir. 2013)*; United States v. Molina*, 172 F.3d 1048, 1056 (8th Cir. 1999).

Holmes and Rendon challenge the reliability of Almonte's testimony, arguing that his methodology has an impermissibly high rate of error. In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993), the Supreme Court made trial judges the gatekeepers to exclude unreliable scientific testimony. In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999), the Court stated that this gatekeeper function applies to all expert testimony, not just testimony based in science. *Daubert* established a non-exclusive checklist for trial courts to use in assessing the reliability of expert testimony. *See* 509 U.S. at 592-94. The checklist includes: (1) whether the theory or technique can and has been tested, (2) whether it has been subjected to peer review, (3) whether there is a high known or potential rate of error, and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community. **Id.** In *Kumho Tire,* the Court explained that, depending upon "the particular circumstances of the particular case at issue," these factors might apply in

assessing the reliability of nonscientific expert testimony. 526 U.S. at 150. Holmes and Rendon focus on the third *Daubert* factor, asserting that Almonte's testimony is unreliable because he acknowledged a high rate of error because many not associated with drug trafficking have statues of Malverde.

Holmes and Rendon misread *Kumho Tire* and exaggerate the importance of error rates in non-scientific evidence. Almonte's testimony is non-scientific evidence, and not all of the *Daubert* factors necessarily apply. **Kumho Tire**, 526 U.S. at 150. Expert testimony must rest on reliable principles and methods, but the "relevant reliability concerns may focus upon personal knowledge or experience" rather than scientific foundations. *Id*. This court has repeatedly approved of law enforcement officials testifying as experts on the modus operandi of drug dealers. *See, e.g.*, **Schwarck**, 719 F.3d at 923; **Molina**, 172 F.3d at 1056 ("A district court has discretion to allow law enforcement officials to testify as experts concerning the modus operandi of drug dealers in areas concerning activities which are not something with which most jurors are familiar."). Law-enforcement officers may testify about the drug trafficking connection of otherwise innocuous household items. **United States v. Jeanetta**, 533 F.3d 651, 657 (8th Cir. 2008). In *Jeanetta*, an officer testified as an expert about the significance of Ziploc bags in the drug trade. Although most users of Ziploc bags are not drug dealers, the bags have drug-trade application. Similarly, even if many with Malverde statues are not affiliated with the drug trade, narco-saint iconography may be an indicator of drug trafficking. The reliability of such evidence comes not from scientific foundations but from Almonte's personal knowledge and experience. **Kumho Tire**, 526 U.S. at 150. The district court did not abuse its discretion in finding Almonte's expert testimony reliable.

Holmes and Rendon assert that Almonte's testimony was irrelevant and unfairly prejudicial. This court has approved as relevant and helpful expert testimony on the modus operandi of drug dealers. **Schwarck**, 719 F.3d at 923-24; **Molina**, 172 F.3d at 1056-57. The standard for relevancy is low. Evidence should be admitted if

it has any tendency to make a fact of consequence more or less probable. **Fed. R. Evid. 401**. In this case, where the government must prove a drug-trafficking conspiracy, drug iconography in the defendant's home is highly relevant. Holmes and Rendon believe that the evidence was unfairly prejudicial because it encouraged guilt from improper reasoning, but Almonte testified that the iconography alone does not indicate drug trafficking activity. The district court properly balanced the probative value of the evidence against its prejudicial effect.

Holmes and Rendon conclude with the argument that Almonte's testimony was "drug courier" profile evidence, which is generally inadmissible. *Florida v. Royer*, 460 U.S. 491, 493 (1983). Drug-courier evidence "involves nothing more than the introduction of investigative techniques that law enforcement officers use to identify potential drug couriers." *Schwarck*, 719 F.3d at 924. *See also* **United States v. Carter**, 901 F.2d 683, 684 (8th Cir. 1990) (describing the "investigative tools" of the Postal Service's "Narcotic Mail Profile Program" as impermissible drug courier profile evidence). Drug-courier evidence is different than "tools of the trade" or "modus operandi" evidence, which frequently focuses on the paraphernalia of drug trafficking. Unlike impermissible courier profile evidence, Almonte was not explaining the investigative techniques law enforcement used to identify Holmes and Rendon. Rather, his testimony explained the significance of drug trafficking iconography located in Rendon's home. Without Almonte's testimony, the significance of such evidence "would not be familiar to average jurors with no previous exposure to the drug trafficking business." *Schwarck,* 719 F.3d at 924. The district court did not abuse its discretion in admitting Almonte's expert testimony.

## II.

Holmes argues that the trial court should have given a limiting instruction on the narco-saint testimony, claiming this testimony was relevant only to Rendon. This

court reviews for abuse of discretion the decision whether to give a limiting instruction. *United States v. Velazquez-Rivera*, 366 F.3d 661, 666 (8th Cir. 2004).

Holmes's argument is without merit. The government had to prove that a conspiracy existed between Holmes, Christian Maldonado, and Gladis L. Maldonado and that Holmes knowingly and intentionally joined it. Rendon was charged with being in the same conspiracy with the Maldonados. Since the narco-saint evidence was relevant to establish the existence of the conspiracy, its admission was proper for both parties, and no limiting instruction was necessary.[2]

## III.

Holmes attacks the sufficiency of the evidence for his conspiracy conviction. This court reviews "challenges to the sufficiency of the evidence de novo, viewing the facts in the light most favorable to the verdict, resolving any evidentiary conflicts in favor of the prosecution, and accepting all reasonable inferences that support the verdict." *United States v. Osuna-Zepeda*, 416 F.3d 838, 841-42 (8th Cir. 2005). This court upholds a verdict if it finds that a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.* at 842.

To prove conspiracy, the government must show: (1) there was a conspiracy; (2) Holmes knew of it; and (3) he intentionally joined it. *United States v. Rolon-Ramos*, 502 F.3d 750, 754 (8th Cir. 2007). "The conspiracy's existence may be proved by direct or circumstantial evidence." *Id.*, *citing United States v. Cain*,

---

[2] Holmes emphasizes an ambiguous comment by the district court: "I don't know that these icons are necessarily as probative of a conspiracy as much as they are of drug trafficking activity." Because the government must prove "that the purpose of [the] agreement was to purchase and distribute the methamphetamine," *United States v. Robinson*, 217 F.3d 560, 564 (8th Cir. 2000), evidence of drug trafficking activity is probative of conspiracy here.

487 F.3d 1108, 1111 (8th Cir. 2007). Large quantities of drugs—rather than amounts consistent with personal use—support an inference that the defendant knew he was part of a larger venture that extended beyond his participation. *United States v. Moya,* 690 F.3d 944, 949 (8th Cir. 2012), *citing United States v. Prieskorn*, 658 F.2d 631, 634-35 (8th Cir. 1981).

The government proved a conspiracy between Daniel L. Henry and the Maldonados. Henry testified that Holmes knew of that conspiracy. Evidence of Holmes's participation in the conspiracy was: (1) the presence of Holmes's nickname in the Maldonados' drug ledger, showing the purchase of meth in distributable quantities; (2) testimony by Henry that Holmes purchased meth from him in distributable quantities; and (3) recorded conversations of the Maldonados and Holmes discussing meth purchases in thinly-veiled language. Based on this evidence, a reasonable jury could find Holmes guilty beyond a reasonable doubt.

IV.

Holmes attacks his sentence, arguing that the district court (a) procedurally failed to determine the scope of the criminal activity he agreed to jointly undertake and (b) erred in finding foreseeable to Holmes the distribution of 500 grams or more of meth. This court reviews de novo the district court's interpretation and application of the Sentencing Guidelines and reviews for clear error its findings of fact. *United States v. Spotted Elk*, 548 F.3d 641, 668 (8th Cir. 2008). "This court will overturn a finding of drug quantity 'only if the entire record definitively and firmly convinces us that a mistake has been made.'" *United States v. Young*, 689 F.3d 941, 945 (8th Cir. 2012), *quoting United States v. Gonzalez-Rodriguez*, 239 F.3d 948, 953 (8th Cir. 2001).

Section 1B1.3 provides that the base offense level should be calculated using "all reasonably foreseeable acts and omissions of others in furtherance of the jointly

undertaken criminal activity." In a drug-distribution conspiracy, "a defendant's conviction for conspiracy does not automatically mean that every conspirator has foreseen the total quantity of drugs involved in the entire conspiracy." **Spotted Elk,** 548 F.3d at 674. Instead, "the district court must find the scope of the individual defendant's commitment to the conspiracy and the foreseeability of particular drug sale amounts from the individual defendant's vantage point." **Id.** "'Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance.'" **Young**, 689 F.3d at 945, *quoting* **United States v. Pugh**, 25 F.3d 669, 677 (8th Cir. 1994).

The district court found that Holmes reasonably could foresee distribution of 500 grams or more of methamphetamine. Nonetheless, at the government's request, the district court sentenced Holmes based on conspiracy to distribute less than 500 grams.[3]

Holmes argues that the district court procedurally failed to determine the scope of the criminal activity he agreed to jointly undertake. This argument is without merit. The district court considered his purchasing patterns and debt for past purchases, both indicating Holmes's commitment to the conspiracy. The district court also considered the foreseeability of particular drug-sale amounts from Holmes's vantage point. The district court properly applied section 1B1.3.

---

[3] The jury found Holmes guilty of conspiring to distribute between 50 and 500 grams of meth. The government made its request to avoid any disparity between the jury's verdict and the district court's sentencing. However, a "district court may impose a sentence based on a drug quantity determination greater than that found by the jury so long as the sentence does not exceed the statutory maximum of the convicted offense and the district court's calculation is supported by sufficient evidence." **Young**, 689 F.3d at 945, *quoting* **United States v. Webb**, 545 F.3d 673, 677 (8th Cir. 2008).

Holmes argues that the district court clearly erred in finding foreseeable the distribution of 500 grams or more of meth. Because the district court sentenced him based on less than 500 grams, any error is harmless. Nonetheless, the district court found "that the quantity of drugs for which Mr. Holmes would be accountable . . . would be 500 grams." The court based this finding on a DEA agent's testimony and the evidence at trial. According to entries in drug ledgers, Holmes received approximately 350 grams from the conspiracy. The district court said distribution of at least another 150 grams by the Maldonados was a foreseeable part of the conspiracy. Holmes argues he withdrew from the conspiracy with the Maldonados, cutting off forseeability, yet he presents no evidence of affirmative withdrawal. *See Smith v. United States*, 133 S.Ct. 714, 721 (2013) (explaining that in a conspiracy withdrawal "must be active" and the burden of establishing it "rests upon the defendant"). Nothing in the record definitively and firmly convinces this court that the district court made a mistake in its findings.

The judgment is affirmed.

KELLY, Circuit Judge, concurring.

I concur in the court's opinion in all respects but one: I believe the district court erred in qualifying Marshal Almonte as an expert and admitting his testimony.

I.

"We review a district court's evidentiary decisions for an abuse of discretion." United States v. Lupino, 301 F.3d 642, 646 (8th Cir. 2002) (citation omitted). Courts frequently, and properly, allow law-enforcement officers to give expert testimony as to the "modus operandi" of drug traffickers. Black's Law Dictionary defines modus operandi as: "a method of operating or manner of procedure; esp. a pattern of criminal behavior so distinctive that investigators attribute it to the work of the same person."

Black's Law Dictionary 1095 (9th ed. 2009). And because jurors may not be familiar with the usual way of trafficking drugs, expert testimony may help them understand how otherwise legitimate or commonplace items can be used in furtherance of the drug trade. United States v. Jeanetta, 533 F.3d 651, 657–58 (8th Cir. 2008) ("The significance of seemingly innocuous household items, e.g., Ziploc bags and scales, along with the presence of sophisticated surveillance equipment, including scanners, cameras, monitors, and night vision goggles, combined with the presence of large amounts of cash, was highly relevant to Jeanetta's claim he was merely a drug user and not a trafficker."); see also United States v. Schwarck, 719 F.3d 921, 924 (8th Cir. 2013) (holding expert testimony about security cameras, radio frequency detectors, and large amounts of cash "permissibly explained the significance of evidence that would not be familiar to average jurors with no previous exposure to the drug trafficking business") (citations omitted).

Marshal Almonte's testimony was not properly characterized as "modus operandi" evidence. His testimony at trial did nothing more than describe a way to profile persons as being part of what he calls the "Mexican drug underworld" based on their purported religious beliefs, as revealed by their possession of religious icons and statuary. Marshal Almonte testified that he teaches law enforcement officers about the "Patron Saints of the Mexican drug underworld," describing religious icons, statuary, prayer cards, and amulets, which he believes are "red flags and indicators" of possible drug activity. He testified that he developed the training sessions for two reasons: to "enhance officer safety" and to allow officers to "us[e] that information to assist them in furthering the investigation possibly leading to criminal activity." He explained: "I tell the officers the rest is up to you to see if you have any other indicators there that would cause you to further investigate and possibly reach probable cause." In short, he has trained law enforcement officers in the use of a tool to assist them in their efforts to identify a particular type of drug trafficker. This is exactly the sort of "drug courier profile" evidence this court has held is inadmissible. See United States v. Quigley, 890 F.2d 1019, 1021 (8th Cir. 1989) (citing Florida v.

-10-

Royer, 460 U.S. 491, 525 n.6 (1983) (Rehnquist, J., dissenting)). "Drug courier profiles are investigative tools, not evidence of guilt." United States v. Carter, 901 F.2d 683, 685 (8th Cir. 1990) ("The admission of a profile into evidence is inherently prejudicial and can easily influence a jury into thinking that the defendant is guilty.").

Marshal Almonte's testimony is also not sufficiently reliable to qualify as expert testimony. There is no "'definitive checklist or test'" to determine when expert testimony is sufficiently reliable and, thus, admissible under Rule 702 of the Federal Rules of Evidence. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999) (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593 (1993)). In this case, the court contends that the reliability of Marshal Almonte's testimony about narco-saint iconography "comes not from scientific foundations but from Almonte's personal knowledge and experience." Personal knowledge and experience may support a finding of reliability, but Marshal Almonte's conclusions are not the product of his personal *law enforcement* knowledge and experience—he did not gather the information about these prayers and beliefs through surveillance, wiretaps, or even interviews of persons involved in this type of drug trafficking. Instead, Marshal Almonte calls upon his own self-study of the "iconography of the Mexican drug underworld," his observations of such icons in narcotics cases, his "four or five" trips to Mexico, and his self-published materials and training seminars on the subject.[4] With this information, Marshal Almonte then profiled individuals based on

[4]Marshal Almonte also relies on his personal experience as a Catholic. For example, he testified at trial that Saint Jude in particular was being "misused in my opinion being a Catholic" by "the drug traffickers and other criminals." He suggested that he, as a Catholic, who "continues to pray to God and to Jesus Christ," would properly "call upon Saint Jude to intervene on my behalf and on behalf of my loved ones who's dying, for a miracle." In contrast, he "believe[d] the criminals pray to Saint Jude because they perceive what they're doing to be a lost cause or at least a very difficult or desperate situation." Not only did he provide no particular examples of such prayers, his personal opinions on the proper use of prayer are beyond the scope of any law enforcement expertise he may have.

-11-

their purported religious beliefs.   Possession or presence of a statue or icon may be a "red flag" or an "indicator" for law enforcement investigative purposes.  But the rate of error of such evidence—evidence of the possession or presence of religious statues, icons, prayer cards, or amulets—as substantive evidence of guilt is too high, without more, to warrant its admissibility.

## II.

While I find the district court abused its discretion in allowing Marshal Almonte to give expert testimony, I also conclude the error was harmless.  "An improper evidentiary ruling is a nonconstitutional error that must be disregarded under Federal Rule of Criminal Procedure 52(a), if it does not have a substantial influence on the verdict."  United States v. Ladue, 561 F.3d 855, 858–59 (8th Cir. 2009) (citing Lupino, 301 F.3d at 645).  "[I]n determining whether an error [is] harmless, we review the trial record as a whole . . . ."  Id. at 859 (quotation omitted).  Based on the record as a whole, I find there was more than sufficient evidence to sustain the convictions of both defendants without Marshal Almonte's testimony.  Given the other evidence of guilt, I cannot say that his testimony had a substantial influence on the verdict.  As such, I find the error was harmless and agree that the judgment of the district court should be affirmed.

_____