LIU, J.,
Dissenting. — As anyone who has ever watched a crime drama on television knows, a suspect who is placed under arrest “has a right to remain silent,” and “any statement he does make may be used as evidence against him . . . .” (Miranda v. Arizona (1966) 384 U.S. 436, 444 [16 L.Ed.2d 694, 86 S.Ct. 1602] (Miranda).) The Miranda warnings, which “have become part of our national culture” (Dickerson v. United States (2000) 530 U.S. 428, 443 [147 L.Ed.2d 405, 120 S.Ct. 2326]), serve as an essential safeguard to protect the Fifth Amendment right against self-incrimination in the context of custodial interrogation. But whether interrogated or not, a suspect in custody has a right under the Fifth Amendment not to incriminate himself. And often the best way not to incriminate oneself is to say nothing.
The court today holds, against commonsense expectations, that remaining silent after being placed under arrest is not enough to exercise one’s right to remain silent. If the police have not given Miranda warnings, the court says, a suspect in custody cannot later claim the protection of the Fifth Amendment unless he breaks his silence and “clearly invoke[s]” the privilege in a manner that “a reasonable police officer in the circumstances would understand.” (Maj. opn., ante, at p. 1228.)
But why? No one disputes that if the police in this case had given Miranda warnings to defendant Richard Tom immediately upon placing him in custody, the prosecutor could not have relied on his postarrest silence to show consciousness of guilt regardless of whether he clearly invoked the Fifth Amendment privilege. Why should the result be any different simply because the police did not give him the Miranda warnings until some time later? Whether warned or not, Tom knew that he had been involved in a serious car crash and that the police had put him in custody because they suspected he *1242 was criminally liable. Indeed, the prosecutor argued that Tom never asked about the occupants of the other vehicle because “he knew he had done a very, very, very bad thing, and he was scared,” and because “he was obsessed with only one thing, that is, saving his own skin.” On the prosecutor’s own account, Tom’s foremost concern naturally would have been to avoid incriminating himself. To hinge the protection of the Fifth Amendment on whether his silence occurred before or after he was given Miranda warnings makes no sense. It simply “create[s] an incentive for arresting officers to delay interrogation in order to create an intervening ‘silence’ that could then be used against the defendant.” (U.S. v. Moore (D.C. Cir. 1997) 322 U.S. App.D.C. 334 [104 F.3d 377, 385] (Moore).)
Moreover, the court does not explain how its rule is supposed to work in practice. As Tom sat in the backseat of the patrol car, he was not being questioned by the police. To whom and how should he have invoked the Fifth Amendment privilege? Was he required to approach an officer on his own initiative and blurt out, “I don’t want to talk”? Would it have been enough for Tom to say just that, without mentioning the Fifth Amendment or otherwise indicating he did not want to incriminate himself? And if so, how would that have been materially different from simply remaining silent? Moreover, why should it matter whether Tom invoked the privilege to a police officer? What purpose would that have served, since no police officer was trying to question him?
Today’s decision conflicts with Ninth Circuit precedent holding that “the government may not comment on a defendant’s post-arrest, pre-Miranda silence in its case-in-chief because such comments would ‘act [] as an impermissible penalty on the exercise of the . . . right to remain silent.’ ” (U.S. v. Velarde-Gomez (9th Cir. 2001) 269 F.3d 1023, 1030 (en banc) (’Velarde-Gomez), quoting U.S. v. Whitehead (9th Cir. 2000) 200 F.3d 634, 638.) This state of the law invites forum shopping by law enforcement and causes confusion for anyone arrested in California on a question that is always important: If I remain silent, can my silence be used against me or not?
The United States Supreme Court has long held that the Fifth Amendment bars comment on a defendant’s decision to remain silent at trial. (Griffin v. California (1965) 380 U.S. 609, 615 [14 L.Ed:2d 106, 85 S.Ct. 1229] (Griffin).) Likewise, in the context of custodial interrogation, “[t]he prosecution may not . . . use at trial the fact that he stood mute or claimed his privilege in the face of accusation.” (Miranda, supra, 384 U.S. at p. 468, fn. 37.) The same “accusation” is present here: An arrest entails an official accusation, supported by probable cause, that the suspect has committed a crime. Instead of today’s counterintuitive holding, I would follow the simple *1243 and sensible rule adopted by the Seventh, Ninth, and District of Columbia Circuits: After being placed in custody, regardless of whether Miranda warnings have been given, the fact that the suspect remained silent may not be used as evidence of guilt in the prosecution’s case-in-chief. (Accord, Velarde-Gomez, supra, 269 F.3d at pp. 1028-1030; Moore, supra, 104 F.3d at p. 385; U.S. v. Hernandez (7th Cir. 1991) 948 F.2d 316, 322-323 (Hernandez).)
I.
In this case, the prosecutor elicited testimony and made comments during trial suggesting that Tom’s silence after the accident showed his consciousness of guilt. In her direct examination of Sergeant Alan Bailey, the prosecutor asked, “So, during any of this time [at the accident scene], the defendant ever ask you about the occupants of the other vehicle?” Sergeant Bailey answered, “No, he did not.” When defense counsel objected, the prosecutor said, “Consciousness of guilt,” and the trial court overruled the objection. In her direct examination of Officer Josh Price, the prosecutor asked, “During those three hours [after the accident], did the defendant ever ask you about the condition of the occupants of the Nissan?” After defense counsel’s objection was overruled, Officer Price answered, “No.” In her closing argument, the prosecutor said that “how [Tom] acted the night of the collision” pointed to “his consciousness of his own guilt.” She said one aspect was “particularly offensive, he never, ever asked, hey, how are the people in the other car doing? Not once. . . . [¶] Not once. Do you know how many officers that he had contact with that evening? Not a single one said that, hey, the defendant asked me how those people were doing. Why is that? Because he knew he had done a very, very, very bad thing, and he was scared. [][] He was scared or — either that or too drunk to care. But he was scared. And he was obsessed with only one thing, that is, saving his own skin.”
Although Tom was not formally arrested until after he had been taken to the police station, the trial court ruled that he was under de facto arrest when Officer Price told him he was not free to leave the accident scene. The Court of Appeal below found, and this court agrees, that Tom was under de facto arrest when the police transported him to the station in a patrol vehicle. The police did not question him about the accident at that point and did not give him Miranda warnings until several hours later at the station. The issue in dispute is the prosecution’s use of Tom’s silence during the postarrest, pr e-Miranda period as part of its case-in-chief.
Because today’s opinion holds that Tom did not clearly invoke the right to remain silent and thus never exercised the right, the court declines to decide “whether the Fifth Amendment bars the use of a defendant’s postarrest, pre-Miranda exercise of the privilege against self-incrimination in the absence of custodial interrogation.” (Maj. opn., ante, at p. 1225; see id. at *1244 pp. 1223-1224 [noting a split of authority on that question].) I would hold that even in the absence of interrogation, the Fifth Amendment’s protections apply at least from the point that a suspect has been placed under arrest or otherwise taken into custody.
The Fifth Amendment to the United States Constitution provides: “No person . . . shall be compelled in any criminal case to be a witness against himself . . . .” The high court has construed this prohibition to mean that a criminal defendant has a right not to testify at trial. If a defendant chooses to remain silent, “the Fifth Amendment . . . forbids . . . comment by the prosecution on the accused’s silence . . . .” (Griffin, supra, 380 U.S. at p. 615.) The high court has also held that the right to remain silent applies during custodial interrogation. In that context, too, the prosecution may not use at trial the fact that a defendant chose to remain silent. (Miranda, supra, 384 U.S. at p. 468, fn. 37.) Miranda mandated warnings that serve as “a prophylactic means of safeguarding Fifth Amendment rights.” (Doyle v. Ohio (1976) 426 U.S. 610, 617 [49 L.Ed.2d 91, 96 S.Ct. 2240] (Doyle).) But the Miranda warnings are not themselves the source of the rights stated in the warnings. The warnings are a means of giving effect to rights that are already operative when the police initiate custodial interrogation.
The question is whether the Fifth Amendment privilege against self-incrimination comes into play even earlier. The high court recently declined to resolve whether the Fifth Amendment bars a prosecutor from using a defendant’s noncustodial silence as evidence of guilt. (Salinas v. Texas (2013) 570 U.S._,_[186 L.Ed.2d 376, 133 S.Ct. 2174, 2179] (Salinas) (plur. opn. of Alito, J.).) But the case before us involves postarrest or custodial silence. The high court has said, in oft-quoted language, that Miranda “requirefs] that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation.” (Doyle, supra, 426 U.S. at p. 617, italics added.) The premise of this statement is that a suspect who has been taken into custody has the right to remain silent, whether or not interrogation ensues. (Hence the familiar refrain: “You are under arrest. You have the right to remain silent. Anything you say may be used against you in a court of law. . . .”) If the police do not give Miranda warnings immediately upon taking a suspect into custody, that does not pretermit or suspend the suspect’s right to remain silent. Were it otherwise, the police would have an incentive to delay the warnings so that any postarrest, pre-Miranda silence could be used against the suspect. (See Moore, supra, 104 F.3d at p. 385.) And the suspect would face possible incrimination by anything he says as well as anything he does not say.
*1245 Some courts have held otherwise, relying on Fletcher v. Weir (1982) 455 U.S. 603 [71 L.Ed.2d 490, 102 S.Ct. 1309] (Fletcher) for the rule that “the government may comment on a defendant’s silence when it occurs after arrest, but before Miranda warnings are given.” (U.S. v. Rivera (11th Cir. 1991) 944 F.2d 1563, 1568 (Rivera)-, see U.S. v. Love (4th Cir. 1985) 767 F.2d 1052, 1063 (Love).) But Fletcher adopted that rule specifically for prosecutorial use of a defendant’s silence to impeach his own testimony at trial. In Fletcher, the high court reaffirmed its holding in Doyle that a prosecutor may not comment on a defendant’s postarrest silence when Miranda warnings have been given, even for impeachment, because the warnings may “induce[] silence by implicitly assuring the defendant that his silence [will] not be used against him.” (Fletcher, at p. 606.) But “[i]n the absence of the sort of affirmative assurances embodied in the Miranda warnings,” no similar unfairness occurs (id. at p. 607), and the use of defendant’s silence for impeachment “follows the defendant’s own decision to cast aside his cloak of silence and advances the truthfinding function of the criminal trial” (Jenkins v. Anderson (1980) 447 U.S. 231, 238 [65 L.Ed.2d 86, 100 S.Ct. 2124] (Jenkins)).
In a nutshell, high court precedent holds that a defendant’s decision to testify at trial effectively waives protection of his pretrial silence for impeachment purposes (per Fletcher and Jenkins) unless the administration of Miranda warnings has estopped the government from commenting on the defendant’s silence altogether (per Doyle and Miranda). Fletcher was simply an application of the general principle that evidence otherwise off-limits to the prosecution may be used to impeach a defendant who chooses to testify at trial. (See Harris v. New York (1971) 401 U.S. 222, 224-226 [28 L.Ed.2d 1, 91 S.Ct. 643]; Walder v. United States (1954) 347 U.S. 62, 65 [98 L.Ed. 503, 74 S.Ct. 354].) Neither Fletcher nor any other high court decision suggests that the Fifth Amendment right to remain silent does not apply in the postarrest, pre-Miranda context.
Recognizing that “the holding in Fletcher is restricted to use of silence for impeachment purposes,” the Eighth Circuit in U.S. v. Frazier (8th Cir. 2005) 408 F.3d 1102 (Frazier) offered a different rationale for allowing the use of postarrest, pre-Miranda silence in the government’s case-in-chief. (Frazier, supra, 408 F.3d at p. 1110.) Noting that the Fifth Amendment prohibits “compelled” self-incrimination, the Eighth Circuit said the key question was “whether Frazier was under any compulsion to speak at the time of his silence.” (Frazier, at p. 1111.) The court reasoned: “Although Frazier was under arrest, there was no governmental action at that point inducing his silence. Thus he was under no government-imposed compulsion to speak. It is not as if Frazier refused to answer questions in the face of interrogation. . . . [A]n arrest by itself is not governmental action that implicitly induces a defendant to remain silent. Fletcher, 455 U.S. at 606.” (Ibid.)
*1246 It is true that Fletcher rejected the contention that “ ‘an arrest, by itself, is governmental action which implicitly induces a defendant to remain silent.’ ” (Fletcher, supra, 455 U.S. at p. 606.) But in doing so, the high court merely sought to distinguish an arrest from the administration of Miranda warnings for the purpose of limiting Doyle's prohibition on the use of silence for impeachment to post-Miranda silence. (Fletcher, at p. 606.) Again, Fletcher nowhere suggested that the Fifth Amendment does not otherwise protect postarrest, pre-Miranda silence. Fletcher simply held that any protection is waived by the defendant’s decision to testify at trial.
In discussing compulsion, Frazier focused on the compulsion inherent in custodial interrogation, which triggers an affirmative governmental inducement to remain silent, namely, the Miranda warnings. But custodial interrogation is not the only type of compulsion that implicates the Fifth Amendment. Griffin addressed a different kind of compulsion. A defendant who decides not to testify at trial does not do so in response to any questioning by the prosecutor or the judge. His silence is not induced by any governmental assurance like the Miranda warnings, nor is it a response to any “government-imposed compulsion to speak.” {Frazier, supra, 408 F.3d at p. 1111.) Yet Griffin held that such silence is protected because “comment on the refusal to testify is a remnant of the ‘inquisitorial system of criminal justice,’ [citation], which the Fifth Amendment outlaws. It is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly.” (Griffin, supra, 380 U.S. at p. 614, fn. omitted.) The element of compulsion arises from the fact that allowing adverse comment on silence puts pressure on the defendant to take the witness stand, thereby undermining “the central purpose of the privilege-to protect a defendant from being the unwilling instrument of his or her own condemnation.” (Mitchell v. United States (1999) 526 U.S. 314, 329 [143 L.Ed.2d 424, 119 S.Ct. 1307] {Mitchell).) This pressure exists even if “a guilty defendant would choose to remain silent despite the adverse inference . . . .” (Id. at p. 331 (dis. opn. of Scalia, J.).)
The rule recognized in Griffin — that the Fifth Amendment privilege against compulsory self-incrimination “prohibit[s] an inference of guilt from a defendant’s rightful silence” — has found “general and wide acceptance in the legal culture” and “has become an essential feature of our legal tradition.” (Mitchell, supra, 526 U.S. at p. 330.) This rule properly applies not only at trial or during custodial interrogation, but at any point after a suspect has been arrested or otherwise taken into custody. For what is common to all of these contexts is that the suspect or defendant faces an official accusation that he has committed a crime. An arrest requires probable cause, and “ ‘[t]he substance of all the definitions’ of probable cause ‘is a reasonable ground for belief of guilt.’ [Citation.] . . . [I]t has come to mean more than bare suspicion; Probable cause exists where ‘the facts and circumstances with their *1247 [(the officers’)] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that’ an offense has been or is being committed.” (Brinegar v. United States (1949) 338 U.S. 160, 175 [93 L.Ed. 1879, 69 S.Ct. 1302] (Brinegar).)
The accusatory nature of an arrest is also confirmed by the investigatory license given to law enforcement after placing a person under arrest. Although subject to limitations (see, e.g., Riley v. California (2014) 573 U.S._ [189 L.Ed.2d 430, 134 S.Ct. 2473] (Riley)), the search incident to arrest doctrine has long authorized police to search an arrestee’s person, personal property, or vehicle for evidence of crime in order to prevent its concealment or destruction. (See Arizona v. Gant (2009) 556 U.S. 332 [173 L.Ed.2d 485, 129 S.Ct. 1710]; United States v. Robinson (1973) 414 U.S. 218 [38 L.Ed.2d 427, 94 S.Ct. 467]; Chimel v. California (1969) 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034].) Further, as pertinent here, California law provides that “[a] person who drives a motor vehicle is deemed to have given his or her consent to chemical testing of his or her blood or breath for the purpose of determining the alcoholic content of his or her blood, if lawfully arrested” for various drunk driving offenses. (Veh. Code, § 23612, subd. (a)(1)(A).) Failure to comply will result in a fine, suspension of the suspect’s driver’s license, and other serious consequences. (Id., §§ 13353, 23612, subd. (a)(1)(D).)
In this case, the Court of Appeal below summarized “the increasingly coercive circumstances” of the police’s interaction with Tom as follows: “[T]he stop in this case was not ‘temporary and brief.’ [Citation.] Rather, defendant was held at the scene for approximately an hour and a half before he was placed into a patrol car and transported to the police station. Moreover, during that time frame of approximately an hour and a half, the atmosphere surrounding defendant’s detention became increasingly coercive. In this regard, after paramedics had examined defendant and police officers had surveyed the accident scene, defendant asked Officer Price if he could walk to his home less than a block away. Price replied, T told him no. That obviously the investigation was still ongoing. We needed him to remain at the scene.’ Later, after police denied defendant’s request to walk home, Officer Fellcer removed defendant from the Toyota Canary, where he was seated with his girlfriend and Gamino, and placed him in the back of the patrol car at approximately 9:30 p.m. Defendant was held in the patrol car for another 20 minutes before he was transported from the accident scene at 9:48 p.m. and driven to the police station for further investigation. At no point prior to defendant’s transportation from the scene did police tell defendant he was free to leave the accident scene. To the contrary, defendant’s request to leave the scene was denied.”
*1248 In light of the coercive and accusatory setting that confronts a suspect who is placed under arrest, allowing adverse comment on the fact that the suspect chose to remain silent “in the face of accusation” (Miranda, supra, 384 U.S. at p. 468, fn. 37) burdens the suspect with a measure of compulsion to talk. In this case, the prosecutor said in her closing argument, “I’m not saying that he has to say sorry as an expression of his guilt or as some kind of confession, but simply as an expression of his regret. Look, I’m sorry those people were hurt.” But such fine parsing seems a bit much to expect from a suspect taken into custody at an accident scene that Officer Price described as “fairly chaotic.” For a person who has been arrested, talking often carries a significant risk of self-incrimination.
The issue of postarrest, pre-Miranda silence typically arises in situations where, as here, the prosecution contends that the defendant, upon being arrested or confronted with contraband, showed consciousness of guilt by reacting with silence instead of concern, surprise, or indignation as an innocent person would. Penalizing silence in this way, thereby pressuring the suspect to speak and possibly incriminate or perjure himself (or both), imposes the same type of burden that Griffin found impermissible in the context of trial. If the right to remain silent did not apply at all in the postarrest, pre-Miranda context, then a suspect would face “the ‘cruel trilemma’ of incriminating himself, lying, or demonstrating his guilt by silence.” (Maj. opn., ante, at p. 1231.) Whatever choice the suspect makes, he becomes “the unwilling instrument of his or her own condemnation.” (Mitchell, supra, 526 U.S. at p. 329.)
In sum, a suspect who has been arrested or otherwise taken into custody has a right under the Fifth Amendment to remain silent, whether or not Miranda warnings have been given.
II.
At the same time, the Fifth Amendment “does not establish an unqualified ‘right to remain silent.’ ” (Salinas, supra, 570 U.S. at p._ [133 S.Ct. at p. 2183] (plur. opn. of Alito, J.).) It protects silence that constitutes an exercise of the privilege against compelled self-incrimination, not silence attributable to other reasons. In order to trigger the Fifth Amendment’s protection, the court today holds, a suspect in custody may not simply remain silent. Instead, the suspect must “clearly,” “timely,” and “unambiguously” invoke the Fifth Amendment privilege (maj. opn., ante, at pp. 1215, 1233) so that “a reasonable police officer in the circumstances would understand that the defendant had invoked the privilege either at or prior to the silence at issue” (id. at p. 1228).
*1249 But this invocation rule lacks sound justification. It is derived from case law addressing what a suspect must do to exercise the Fifth Amendment privilege in the face of questioning by law enforcement. The issue of whether a suspect’s postarrest, pre-Miranda silence may be used at trial as evidence of guilt ordinarily arises in situations where, as here, the silence did not occur in response to interrogation. That is because any response to pre-Miranda (i.e., unwarned) custodial interrogation would be inadmissible under Miranda itself. As explained below, the concerns that justify a clear invocation rule in the context of police questioning do not justify application of the same rule here. This case is not about police interrogation; it is about the prosecution’s use of a suspect’s postarrest, pre-Miranda silence to prove guilt at trial.
First, it is settled that “a witness confronted with questions that the government should reasonably expect to elicit incriminating evidence ordinarily must assert the privilege rather than answer if he desires not to incriminate himself.” (Minnesota v. Murphy (1984) 465 U.S. 420, 429 [79 L.Ed.2d 409, 104 S.Ct. 1136], italics added.) As the italicized words show, this rule applies when the prosecution seeks to incriminate a defendant not on the basis of silence, but on the basis of what the defendant said in response to government questioning. The reason is that “if he chooses to answer, his choice is considered to be voluntary” and thus waives any privilege he might have exercised. {Ibid.) The right to remain silent may be waived by a defendant’s voluntary answers during a noncustodial interview (see id. at pp. 429-434) or during custodial interrogation, even when the answers follow a prolonged silence (see Berghuis v. Thompkins (2010) 560 U.S. 370, 382-387 [176 L.Ed.2d 1098, 130 S.Ct. 2250] (Berghuis)). But these cases, which involve a decision to speak in response to questioning, do not stand for the odd proposition that a decision to remain silent in the absence of questioning likewise waives the right to remain silent unless the defendant has clearly invoked it.
Second, the high court has adopted a clear invocation rule in order to guide police conduct in the specific context of custodial interrogation. In Davis v. United States (1994) 512 U.S. 452 [129 L.Ed.2d 362, 114 S.Ct. 2350], the high court held that a suspect who wants to invoke the right to counsel during custodial interrogation must do so “unambiguously,” that is, “sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.” (Id. at p. 459.) In Berghuis, the high court applied the same rule to invoking the right to remain silent during custodial interrogation. {Berghuis, supra, 560 U.S. at p. 381.) The rationale for this rule — in particular, its “objective inquiry” into what “a reasonable police officer in the circumstances would understand” — is “[t]o avoid difficulties of proof and to provide guidance to officers conducting interrogations.” (Davis, at pp. 458-459; see Berghuis, at p. 382 [“If an ambiguous act, omission, or statement could require police to end the interrogation, police *1250 would be required to make difficult decisions about an accused’s unclear intent and face the consequence of suppression ‘if they guess wrong.’ [(Davis, at p. 461.)]”].) But the need to give clear guidance to police officers so they do not have to guess whether to stop questioning a suspect has nothing to do with the issue in this case. The issue here is not whether the police overstepped in questioning Tom about the circumstances of the accident against his wishes. The issue is whether the prosecution overstepped in using Tom’s silence in the absence of questioning as part of its case-in-chief.
Third, in the context of noncustodial police questioning, as in Salinas, there are additional reasons for a clear invocation rule: “That requirement ensures that the Government is put on notice when a witness intends to rely on the privilege so that it may either argue that the testimony sought could not be self-incriminating, see Hoffman v. United States, 341 U.S. 479, 486 [95 L.Ed. 1118, 71 S.Ct. 814] (1951), or cure any potential self-incrimination through a grant of immunity, see Kastigar v. United States, 406 U.S. 441, 448 [32 L.Ed.2d 212, 92 S.Ct. 1653] (1972). The express invocation requirement also gives courts tasked with evaluating a Fifth Amendment claim a contemporaneous record establishing the witness’ reasons for refusing to answer. See Roberts v. United States, 445 U.S. 552, 560, n. 7 [63 L.Ed.2d 622, 100 S.Ct. 1358] (1980) (‘A witness may not employ the privilege to avoid giving testimony that he simply would prefer not to give’); [citation]. In these ways, insisting that witnesses expressly invoke the privilege ‘assures that the Government obtains all the information to which it is entitled.’ [Citation.]” (Salinas, supra, 570 U.S. at p. _ [133 S.Ct. at p. 2179] (plur. opn. of Alito, J.).)
These concerns are also far afield from the issue here, which does not involve an attempt by the government to obtain incriminating information from Tom. When a witness is being questioned by a government officer, a clear invocation rule gives the government an opportunity to dispel any real or perceived risk of self-incrimination and, in turn, to lawfully insist that the witness provide the information sought. Absent a risk of self-incrimination, the witness cannot rely on the Fifth Amendment in refusing to answer. That explains why Roberts v. United States, supra, 445 U.S. 552 (Roberts) held that the defendant’s refusal, before and after his arrest, to name the suppliers of illegal drugs could be used against him at trial. The information sought by the government would have incriminated others; there was no reason to think it would have (further) incriminated Roberts. In that context, Roberts’s failure to invoke the privilege precluded his reliance on it. The precise holding of Roberts is: “At least where the Government has no substantial reason to believe that the requested disclosures are likely to be incriminating, the privilege may not be relied upon unless it is invoked in a timely fashion.” (Id. at p. 559, italics added; see id. at p. 562 (cone. opn. of Brennan, J.) [“[B]ecause the Government questioning to which he failed to respond was *1251 not directed at incriminating him, petitioner may not stand upon a Fifth Amendment privilege that he never invoked at the time of his silence.”].)
Thus, a clear invocation is required when it is necessary to put the government on notice that a defendant’s refusal to answer questions is based on fear of self-incrimination. In this case, Tom’s silence about the crash victims did not occur in response to police questioning. The dispute does not involve an effort by the government to obtain incriminating information from a suspect, and there is no similar problem of notice. Indeed, the state can hardly suggest it had “no substantial reason to believe” Tom remained silent for fear of self-incrimination (Roberts, supra, 445 U.S. at p. 559) when the prosecution’s whole point was that Tom said nothing about the accident victims because he was consumed by consciousness of his own guilt.
Nor does the three-justice plurality opinion in Salinas, on which today’s opinion heavily relies, support a clear invocation rule here. (See Salinas, supra, 570 U.S. at p._[133 S.Ct. at p. 2177] (plur. opn. of Alito, J., joined by Roberts, C. J., and Kennedy, J.).) The plurality concluded that the Fifth Amendment did not bar the prosecution from using Salinas’s precustodial, pr e-Miranda silence in response to police questioning as evidence of his guilt because “he did not expressly invoke the privilege against self-incrimination in response to the officer’s question.” (Salinas, at p. _ [133 S.Ct. at p. 2178].) The plurality’s rationale is inapplicable to postarrest, pre-Miranda silence for two reasons.
First, Salinas, like the other cases above, involved police questioning. As its dominant theme, the plurality emphasized “ ‘the general principle that the Government has the right to everyone’s testimony.’ ” (Salinas, supra, 570 U.S. at p._[133 S.Ct. at p. 2179] (plur. opn. of Alito, J.); see id. at p._[133 S.Ct. at p. 2181] [adopting an. exception to invocation requirement “would needlessly burden the Government’s interests in obtaining testimony”].) The plurality reasoned that limiting the protection of silence by means of an invocation role properly “pressurefs] suspects” into answering the government’s questions (id. at p._[133 S.Ct. at p. 2183]) and thereby “ ‘assures that the Government obtains all the information to which it is entitled’ ” (id. at p. _ [133 S.Ct. at p. 2179]). As noted, postarrest, pre-Miranda silence typically (as in this case) does not involve a refusal to answer questions posed by law enforcement, since unwarned questioning of a suspect in custody generally does not yield admissible evidence. (See Velarde-Gomez, supra, 269 F.3d at pp. 1026-1028 [silence upon police discovery of contraband]; Moore, supra, 104 F.3d at p. 384 [same]; Frazier, supra, 408 F.3d at p. 1109 [silence upon being arrested]; Hernandez, supra, 948 F.2d at p. 322 [same]; Rivera, supra, 944 F.2d at pp. 1567-1568 [silence during police inspection of luggage for contraband]; Love, supra, 767 F.2d at p. 1063 [no *1252 police questioning; defendants “made no effort to explain their presence at the Lee farm on the night of their arrest”].)
Second, although the Salinas plurality went beyond Roberts in applying the invocation rule “even when an official has reason to suspect that the answer to his question would incriminate the witness” (Salinas, supra, 570 U.S. at p._[133 S.Ct. at p. 2181] (plur. opn. of Alito, J.)), the opening words of the plurality opinion remain significant: “Without being placed in custody or receiving Miranda warnings, petitioner voluntarily answered the questions of a police officer who was investigating a murder.” (Id. at p._[133 S.Ct. at p. 2177], italics added.) Despite “official suspicions,” the plurality reasoned, the fact that a person voluntarily agreed to a noncustodial interview with the police renders his silence in response to questioning “ ‘insolubly ambiguous.’ ” (Id. at p._[133 S.Ct. at p. 2182].) In such circumstances, “someone might decline to answer a police officer’s question in reliance on his constitutional privilege. But he also might do so because he is trying to think of a good lie, because he is embarrassed, or because he is protecting someone else. Not every such possible explanation for silence is probative of guilt, but neither is every possible explanation protected by the Fifth Amendment.” (Ibid.) In saying this, the Salinas plurality was treating noncustodial silence as a broad category. Given the range of possible reasons for silence in cases where a witness voluntarily submits to a noncustodial police interview, the plurality thought it best to adopt an express invocation requirement for the entire category, even if “reliance on the Fifth Amendment privilege is the most likely explanation for silence in a case such as [Salinas’s].” (Ibid.)
After a person has been arrested, however, the context is different. As discussed earlier, an arrest entails a formal accusation based on probable cause, and “probable cause means ‘a fair probability that contraband or evidence of a crime will be found ....’” (United States v. Sokolow (1989) 490 U.S. 1, 7 [104 L.Ed.2d 1, 109 S.Ct. 1581].) Probable cause is a higher standard than “a reasonable suspicion supported by articulable facts that criminal activity ‘may be afoot.’ ” (Ibid.; see Brinegar, supra, 338 U.S. at p. 175.) Accordingly, a suspect’s silence after being arrested gives rise to a much stronger inference of reliance on the Fifth Amendment privilege than a witness’s noncustodial silence even “in the face of official suspicions.” (Salinas, supra, 570 U.S. at p. _ [133 S.Ct. at p. 2182] (plur. opn. of Alito, J.).) When “official suspicions” have ripened into probable cause for arrest, a suspect’s silence correspondingly becomes more suggestive of fear of self-incrimination. Just as the Salinas plurality’s invocation rule is premised on the relatively uncertain reasons for silence in the noncustodial context, a rule that bars use of a suspect’s postarrest, pro-Miranda silence as evidence of guilt is premised on the relatively predictable reason for silence in the custodial context.
*1253 In reality, neither rule is perfect. There will be cases where the true reason for a suspect’s custodial silence is something other than fear of self-incrimination, just as there will be cases where the true reason for a witness’s noncustodial silence is fear of self-incrimination even though the witness failed to expressly invoke the Fifth Amendment. But the different rules are intended to govern two broad categories of cases — custodial and noncustodial — in light of a general feature that differentiates them, i.e., the accusatory nature of an arrest. No general rule can perfectly capture the true reason for silence in every case; Salinas, for example, may well have remained silent for fear of self-incrimination. (See Salinas, supra, 570 U.S. at p._[133 S.Ct. at p. 2182] (plur. opn. of Alito, J.); id. at pp. - [133 S.Ct. at pp. 2189-2190] (dis. opn. of Breyer, J.).) Nevertheless, the generality of the rules in this context, as in others, is designed to yield fair results in the mine run of cases to which they apply and, equally important, to set expectations and guide future conduct by law enforcement and the citizenry. (Id. at p._ [133 S.Ct. at p. 2183] (plur. opn. of Alito, J.); cf. Riley, supra, 573 U.S. at p._[134 S.Ct. at p. 2495] [rejecting various fact-based limitations on the warrant requirement in favor of a “simple” rule for searching cell phones incident to arrest — “get a warrant”].) Today’s decision seems unlikely to yield fair results in most cases because it is so counterintuitive. Here, as in Riley, it is better to adopt a simple rule consistent with ordinary expectations: Upon being arrested, you have a right to remain silent in order to avoid self-incrimination, and if you remain silent, your silence may not be used against you as evidence of guilt.
Today’s decision gives rise to two additional concerns. First, in rejecting the contention that the invocation rule will give law enforcement an incentive to delay Miranda warnings after an arrest, the court says “the same incentive to delay Miranda warnings already exists by virtue of the high court’s decision in Fletcher v. Weir . . . .” (Maj. opn., ante, at p. 1234.) But this concern surely has “greater force here” (id. at p. 1235) because Fletcher involved only the use of silence to impeach the defendant at trial if he chooses to testify, whereas the issue here is the use of silence to prove guilt in the prosecution’s case-in-chief. Whatever incentive police officers may have to delay Miranda warnings when they do not know whether a suspect will end up testifying at trial, they certainly have a greater incentive to delay Miranda warnings when any postarrest silence may be used to prove the suspect’s guilt unless he clearly invokes the Fifth Amendment privilege.
Second, how is the invocation rule supposed to work in practice? Because pre-Miranda silence ordinarily does not occur in response to police questioning, the court must envision that a suspect, immediately after being arrested, will take the initiative to get a police officer’s attention and declare his desire to invoke the Fifth Amendment privilege. Assuming the suspect has the awareness and presence of mind to do that (even in a “fairly chaotic” *1254 situation like the car accident here), what exactly must he say? Crucially, is it enough for a suspect to say, “I don’t want to talk”? Or must the suspect mention the Fifth Amendment or otherwise indicate that the reason he does not want to talk is to avoid self-incrimination? (See Quinn v. United States (1955) 349 U.S. 155, 164 [99 L.Ed. 964, 75 S.Ct. 668] [“no ritualistic formula is necessary in order to invoke the privilege”].)
The rationale for the invocation rule would suggest that a suspect must make clear “his reasons” for wanting to remain silent. (Salinas, supra, 570 U.S. at p._[133 S.Ct. at p. 2183] (plur. opn. of Alito, J.).) Yet this court, perhaps sensing how unrealistic this is, cannot bring itself to say that this is required. Instead, among the examples it gives of situations where “the defendant actually invoked his rights” (maj. opn., ante, at p. 1233), the court cites U.S. ex rel. Savory v. Lane (7th Cir. 1987) 832 F.2d 1011, where the defendant told police “that ‘he didn’t want to talk about it, he didn’t want to make any statements.’ ” (Id. at p. 1015.) If saying that is enough for a suspect to put the police on notice that his reason for remaining silent is to avoid self-incrimination, then I do not see how simply remaining silent is materially different. The statement “I don’t want to talk” is no more suggestive of a suspect’s reason for silence than the act of remaining silent itself. In either case, the desire to avoid self-incrimination is a natural inference from the fact that the suspect faces an official accusation of crime supported by probable cause. We should not “exalt form over substance” in recognizing the exercise of constitutional rights by ordinary people. (Escobedo v. Illinois (1964) 378 U.S. 478, 486 [12 L.Ed.2d 977, 84 S.Ct. 1758].)
III.
For reasons persuasively set forth by the Court of Appeal below, the prosecution’s use of Tom’s silence about the crash victims in its case-in-chief cannot be deemed harmless error. The jury was instructed that “[g]ross negligence is the exercise of so slight a degree of care as to exhibit a conscious indifference or T don’t care’ attitude concerning the ultimate consequences of one’s conduct.” Relying on testimony of an accident reconstruction expert, the prosecutor argued that Tom’s preimpact speed was at least 67 miles per hour, demonstrating gross negligence. But this testimony was disputed by a defense expert who estimated Tom’s speed to be around 50 miles per hour, a speed that police deemed safe for that road under certain conditions. Given this conflicting expert testimony, the prosecutor’s emphasis on Tom’s failure to ask about the crash victims was a significant aspect of her claim that Tom “was driving down that night . . . without a care of what was going to happen. I don’t care is the attitude that he had.” The improper use of Tom’s postarrest, pre-Miranda silence was not harmless beyond a reasonable doubt. (Chapman v. California (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)
*1255 For the reasons above, I would affirm the judgment of the Court of Appeal.
Rylaarsdam, J.,* concurred.
Appellant’s petition for a rehearing was denied October 1, 2014. Werdegar, J., was of the opinion that the petition should be granted.

Associate Justice of the Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.